IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| ESTATE OF RUTH C. BISIGNANO, by and through its administrator, FRED HUNTSMAN; and ESTATE OF FRANK BISIGNANO, as successor in interest to RUTH C. BISIGNANO, by and through its administrator, FRED HUNTSMAN, <br><br>           Plaintiffs, <br><br>     vs. <br><br> EXILE BREWING COMPANY, LLC, <br><br>           Defendant. | 4:22-cv-00121-SHL-SBJ <br><br><br><br> **ORDER DENYING MOTION TO CERTIFY** |

Ten months ago, Defendant Exile Brewing Company, LLC ("Exile") removed this case to federal court after Plaintiffs added federal law claims for the first time, following almost two years of litigation in Iowa state court. Exile now seeks to send the case back to state court in the form of eight certified questions to the Iowa Supreme Court. The questions are largely hypothetical and, where they are not, this Court is capable of answering them. Certification is therefore not appropriate and would serve only to delay resolution of an already long-running case. Exile's Motion to Certify is DENIED.

## I.  BACKGROUND[1]

### A.  Ceva Ruth-Lucille Bisignano ("Ruthie") Inspires Exile's Gold Lager Beer.

The parties' dispute centers around the name and likeness of Ceva Ruth-Lucille Bisignano, known professionally as "Ruthie." (ECF 1-5, ¶ 14.) From 1950 to 1971, Ruthie owned and operated Ruthie's Lounge in Des Moines, Iowa. (Id., ¶ 15.) During that time, she became locally (and later internationally) famous for her bar trick of "filling two pint glasses while balancing them on her breasts and serving them without ever touching them with her hands." (Id., ¶ 16.) This skill was widely publicized in newspapers and attracted patrons from all over the country to her Lounge,

---

[1] This section does not constitute findings of fact and is provided for background only. In summary judgment proceedings in the state court action that preceded Exile's removal to this Court, Exile declined to admit facts about Ruthie, her Lounge, and her marriage to Frank; it's unclear what aspects of Ruthie's story Exile admits. (See, e.g., ECF 4, pp. 391–95.)

allowing her to charge almost three times as much for drinks than other bars in town. (Id., ¶¶ 17, 19, 21, 23.) Ruthie died in 1993, but the legend of her bar trick and Lounge lived on. (Id., ¶ 27.)

In 2012, Exile opened a brewery and brew pub in Des Moines, Iowa. (Id., ¶ 28.) It is undisputed that Exile's flagship beer, a gold lager called "Ruthie," was inspired by Ceva Ruth-Lucille Bisignano. (ECF 46, ¶ 14(h).) Prior to using Ruthie's name and/or likeness for their flagship beer, Exile searched for products and trademarks using the name "Ruthie," searched for pictures of Ruthie, and searched for children, an estate, or a trust for Ruthie. (Id., ¶ 14(i).) Exile alleges it did not locate anyone claiming a right to use the name "Ruthie," so it commenced using it in conjunction with its gold lager on August 1, 2012. (Id., ¶ 14(j).)

The beer's association with Ruthie is clear: its logo features a picture of a woman balancing two beers on her breasts and is advertised as "[t]he world's best balanced beer," a phrase borrowed from one of Ruthie's Lounge's signs directing patrons to "ask for the well balanced beer" to see Ruthie's bar trick. (ECF 1-5, ¶¶ 20, 30–31.) Plaintiffs also allege that Exile generally leaned on Ruthie's reputation as a "sassy, tough, quick witted, independent, and confident business operator, bartender, and woman" when it re-designed the Ruthie beer's label a few years after opening, emphasizing the "persona of a confident, independent, powerful female bartender." (Id., ¶¶ 24, 34–35.)

Exile's Ruthie beer has been hugely successful. It is Exile's best-selling beer and comprises more than half of its annual production. (Id., ¶ 39(a).) It is the best-selling Iowa-made beer in the state and, in 2015, one source indicated it was the fifth biggest seller in the county. (Id., ¶¶ 39(b)–(c).) Patrons can purchase it at bars and restaurants throughout the state and, like Ceva Ruth-Lucille Bisignano, the Ruthie beer has received national attention in mainstream publications and online forums populated with beer enthusiasts. (Id., ¶¶ 40(c), 41(a).) In 2019, Exile sought a trademark for "RUTHIE," which was granted in 2021. (ECF 46, ¶ 14(k).)

B. *Fred Huntsman Reopens Ruthie and Frank Bisignano's Estates.*

Ruthie was married to Frank Bisignano. (ECF 5, p. 153.) Plaintiff Fred Huntsman is Frank Bisignano's nephew and surviving heir. (Id., p. 268.) He learned of Exile's Ruthie beer, and its connection to his Aunt Ruthie, within a few years of Exile opening. (ECF 46, ¶ 14(m)–(n).) At some point thereafter, he began investigating claims against Exile for using Ruthie's name and likeness. As a claimed heir to Frank and/or Ruthie's estates, his first step was petition to have those estates reopened.

Ruthie's Estate, and original probate proceeding, was closed on or about August 5, 1993. (ECF 5, p. 267.) The list of estate assets made no reference to her name or likeness as property and, consequently, rights to her name and likeness were not distributed to her heirs. (Id.) Frank passed approximately three years after Ruthie, dying intestate in November 1996. (Id.) His Estate, and original probate proceeding, was closed on or about August 21, 1999. (Id.) Like Ruthie's Estate, Frank's Estate did not mention her name or likeness as property and, consequently, rights to Ruthie's name and likeness were not distributed to Frank's heirs, either. (Id.)

On March 9, 2020, Huntsman petitioned to have Frank's Estate reopened, alleging that he "hired an attorney to investigate and pursue potential claims against a corporation" that, if successful, would benefit Frank's Estate. (ECF 5, p. 268; ECF 3, pp. 247–48.) The probate court granted Fred's petition the following day and reopened Frank's Estate,[2] appointing Huntsman as the administrator. (ECF 5, p. 268.) Several months later, on September 18, 2020, Huntsman petitioned to have Ruthie's Estate reopened for the same reason. (Id., p. 269; ECF 3, pp. 249–50.) The probate court granted that petition on September 22, 2020, reopening Ruthie's Estate[3] and appointing Huntsman as the administrator. (ECF 5, p. 269.)

C. *The Estates Sue Exile in Iowa State Court.*

On June 1, 2020, Fred Huntsman, in his capacity as the Administrator of Frank's Estate, filed a petition in the Iowa District Court for Polk County[4] alleging that Exile misappropriated Ruthie's intellectual property. (ECF 2, p. 1.) The Petition included six causes of action, all arising under state law: (1) common law appropriation of name and/or likeness; (2) common law appropriation of commercial value and infringement on the right to publicity; (3) common law misappropriation of trade values; (4) consumer fraud pursuant to Iowa Code Chapter 714H; (5) common law deceptive marketing for misrepresentations regarding endorsement and/or approval; and (6) common law trade and service mark infringement. (Id., pp. 1–20.)

Exile moved to dismiss, claiming the Estate lacked standing, the court lacked jurisdiction, the Estate's claims were barred by the statute of limitations, and the Estate's claims were otherwise legally or factually deficient. (ECF 2, pp. 25–31.) As relevant to the instant motion, Exile argued that Iowa law does not yet recognize Counts II, III, and V. (Id., p. 28.) The Iowa District Court for

---

[2] Iowa District Court for Polk County, Probate Court No. ESPR040450.
[3] Iowa District Court for Polk County, Probate Court No. ESPR033730.
[4] Iowa District Court for Polk County, No. CVCV060249.

Polk County[5] rejected each of Exile's arguments and denied its motion on August 18, 2020. (Id., pp. 78–85.) In doing so, it agreed that "Plaintiff cannot cite to any Iowa case where these causes of action were recognized," but "Defendant cannot cite to any case where the causes of action have been rejected." (Id., p. 81.) It held that "[l]ike any other legal issue, the Iowa Supreme Court will have the ultimate say, but that does not mean this Court should not do its best to interpret the law and rule accordingly." (Id., p. 82.) Thereafter, the court held that Counts II, III, and V were "valid based on Iowa's longstanding protection of an individual's right to privacy." (Id.) Exile answered the Estate's petition one month later (id., p. 91) and the litigation carried on.

The civil litigation overlapped with events in the probate proceedings. For example, after Huntsman reopened Ruthie's Estate on September 22, 2020, Frank's Estate successfully moved to add Ruthie's Estate as a plaintiff the civil case on October 19, 2020. (Id., p. 147.) Both Estates then moved for partial summary judgment on June 3, 2021, seeking disposition in their favor on Counts I and II (right of publicity claims) as well as a permanent injunction to enjoin Exile from continued use of Ruthie's name and/or likeness. (Id., pp. 501–04.) Exile resisted (ECF 4, p. 391) and, on August 13, 2021, filed a cross-motion for summary judgment on Counts I and II while additionally claiming that standing, jurisdiction, laches, and judicial estoppel warranted dismissing the Estates' entire action (id., p. 457). The Estates resisted Exile's cross-motion. (Id., p. 529.)

On August 19, 2021, while those motions were pending in the civil proceeding, Exile, as an interested party, filed a motion to vacate, dismiss, and close Frank and Ruthie's Estates in their respective probate court proceedings. (ECF 5, p. 269.) Exile argued the probate court did not have jurisdiction to reopen either of those estates to re-distribute Ruthie's intellectual property. (Id.) Exile's arguments in probate court mirrored some of the arguments it made in the civil proceeding, where it asserted the Estates were improperly reopened and thus lacked standing to bring claims. (Id.)

The probate court[6] ruled first. On November 16, 2021, it held that "new property" in the form of "potential claims against Exile" had been found, giving the probate court jurisdiction to reopen both Estates under Iowa Code § 633.489. (Id.) The probate court did not decide, however, whether Ruthie's intellectual property could or did descend to Ruthie's heirs, instead of passing into the public domain. (Id., pp. 269–70.) The probate court further held that Exile had no right to

---

[5] District Judge David Nelmark, Fifth Judicial District of Iowa.
[6] Associate Probate Judge Craig E. Block, Fifth Judicial District of Iowa.

intervene in the probate proceedings for the purpose of challenging the probate court's jurisdiction or otherwise protecting its intellectual property rights. (Id., p. 270.) Exile filed a motion to reconsider on November 24, 2021, which the probate court denied on January 31, 2022 (the "Final Probate Order"). (Id.) The probate court again declined to decide the issue of whether Ruthie's intellectual property descended, holding instead that was an issue for the district court to decide in the parallel civil proceeding. (Id.)

Meanwhile, on January 18, 2022, the district court issued its ruling[7] on the Estates' motion for partial summary judgment and Exile's cross-motion (the "Civil Order"). (Id., pp. 153–63.) At the outset, it "[took] no action" on Exile's arguments regarding standing and jurisdiction, deferring instead to the probate court's conclusion that the Estates were properly reopened. (Id., p. 155.) The district court stated that it "does not stand in appellate capacity" to the probate court or its decision. (Id., p. 155.) On the merits, the district court held: (1) even though the "right to publicity" has not been previously adopted in Iowa, it is likely the Iowa Supreme Court would recognize it; (2) factual issues precluded summary judgment on Counts I and II; and (3) the Estates' motion for a permanent injunction was premature. (Id., pp. 153–63.) The district court therefore denied both parties' motions in their entirety. (Id., p. 162.) The Estates filed a motion to reconsider this ruling on February 2, 2022 (id., p. 177), which Exile resisted (id., p. 313), and the court ultimately denied on April 4, 2022 (id., p. 671).

> D. *Exile Appeals the Final Probate Order and Files an Application for Interlocutory Appeal of the Civil Order to the Iowa Supreme Court.*

On February 14, 2022, Exile appealed the Final Probate Order to the Iowa Supreme Court. (Id., p. 254.) Exile explained that the probate court declined twice to decide whether Ruthie's intellectual property could or did descend through intestate succession to her heirs, instead holding that was "an issue the [state] District Court presiding over the compl[e]mentary civil case must decide." (Id., p. 255.) The district court, however, "took no action" on jurisdiction or standing, deferring instead to the probate court. (Id.) Exile therefore stated that it intended to file a separate application for interlocutory appeal of the Civil Order, along with a motion to consolidate both appeals so that "issues of whether Ruth Bisignano's intellectual property was capable of and did descend to her heirs are addressed." (Id., pp. 255–56.) Exile argued that "[t]hese issues are of significant jurisdictional concern in that they bear on whether each of the [] Estates can be reopened

---

[7] District Judge Samantha Gronewald, Fifth Judicial District of Iowa.

under the Probate Court's jurisdictional limitations, as well as whether the Estates have standing to pursue (and the [state] District Court has jurisdiction to hear) claims that the intellectual property of Ruth Bisignano was misappropriated by Exile [] more than 20 years after Ruth Bisignano passed away intestate with no distribution of her intellectual property being made in the 1993 proceedings to close her estate." (Id., p. 256.)

As promised, Exile filed an application for interlocutory appeal of the Civil Order the next day, on February 15, 2022. (Id., p. 263.) It asked for its appeal of the Civil Order to be consolidated with its appeal of the Final Probate Order, and that the civil proceedings be stayed while the Iowa Supreme Court considered the appeals. (Id.) It reiterated that "[b]ecause the two Courts have deferred to one another on the key jurisdictional and standing issues in the case, judicial efficiency would be best served if the Iowa Supreme Court provided guidance as to what Court must decide the issue and the issues should be decided." (Id., p. 266.) Exile requested the Iowa Supreme Court provide interlocutory review of four issues:

A. Whether the Probate Court or [state] District Court is responsible for deciding whether intellectual property rights are capable of descending through intestate succession.
B. Whether the intellectual property rights at issue in these cases are capable of descending through intestate succession.
C. Whether the subject intellectual property did descend to the heirs of the Estates.
D. If any intellectual property rights did descend, identify the specific rights that descended.

(Id., p. 274.)

The Iowa Supreme Court retained Exile's appeal of the Final Probate Order, but on March 10, 2022, it denied Exile's application for interlocutory appeal of the Civil Order. (Id., p. 422.) It also denied Exile's request to stay the civil proceedings and to consolidate the appeals as moot. (Id.) The probate appeal[8] was fully briefed for the Iowa Supreme Court's consideration as of November 29, 2022. (ECF 46-6.) It is scheduled for oral argument on March 30, 2022.

*E. Exile Removes the Civil Case to Federal Court, Seeks to Certify Eight Questions to the Iowa Supreme Court.*

On February 11, 2022, prior to Exile's appeals, the Estates moved to amend their Petition in the civil proceedings to replace their common law claim for trade and service mark infringement with a claim for deceptive advertising and false designation of origin under the Lanham Act, 15

---

[8] Iowa Supreme Court, No. 22-0288.

U.S.C. § 1125(a). (ECF 5, pp. 198–99.) The district court granted the motion on April 4, 2022. (Id., p. 672.) Four days later, Exile removed the case to this Court on the basis of federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1446(b)(3). (ECF 1.) The case is scheduled for trial on January 16, 2024. (ECF 37.) The current dispositive motion deadline is April 27, 2023. (Id.)

Exile filed the instant motion to certify on January 11, 2023. (ECF 46.) Exile asks this Court to certify eight questions to the Iowa Supreme Court:

1. If it is determined by the Iowa Supreme Court that the Probate Court had no jurisdiction to reopen these Estates, as a matter of Iowa law does any individual or entity have a legal intellectual property interest that may be pursued through a cause of action filed by or on behalf of deceased Iowa residents, Ruth C. Bisignano and/or Frank Bisignano.

2. If it is determined by the Iowa Supreme Court that Huntsman has no standing to reopen these Estates, as a matter of Iowa law does any individual or entity have a legal intellectual property interest that may be pursued through a cause of action filed by or on behalf of deceased Iowa residents, Ruth C. Bisignano and/or Frank Bisignano.

3. If it is determined by the Iowa Supreme Court that some individual or entity has a legal intellectual property interest that may be asserted by or on behalf of the deceased Iowa residents, Ruth C. Bisignano and Frank Bisignano, which of the following causes of action pled in the Second Amended Complaint, if any, would be adopted as Iowa's common law:
   a. Count I: Appropriation of Name and/or Likeness under Iowa Common Law
   b. Count II: Unfair Competition – Appropriation of the Commercial Value of Ruthie's Identity and Infringement of the Right of Publicity under Iowa Common Law
   c. Count III: Unfair Competition – Misappropriation of Trade Values under Iowa Common Law.
   d. Count V: Deceptive Marketing – Misrepresentations Regarding Endorsement and/or Approval Under Iowa Common Law.

4. For each cause of action adopted, what specific elements must be satisfied to meet the burden of proving that cause of action?

5. For each cause of action what statute of limitations applies?

6. For each cause of action, would the Iowa Supreme Court adopt the re-publication interpretation of the continuous tort doctrine? *See Blair v. Nevada Landing Partnership*, 369 Ill.App.3d 318, 323 (2006) (holding that re-publication of the same name and likeness in subsequent advertisements and different mediums did not constitute a new wrongful act, such that the

continuous tort doctrine did not apply and the statute of limitations barred the plaintiff's right of publicity claim).

7. Would Iowa adopt the *Stouffer* six factor test to determine whether the speech at issue is expressive and, therefore entitled to First Amendment protection? *See In re Elster*, 26 F.4th 1328, 1333 (Fed. Cir. 2022); *UFO Magazine, Inc. v. Showtime Network, Inc.*, 2022 WL 16644914 (D. Wy. 2022); *Stouffer v. Nat'l Geographic Partners*, 460 F.Supp.3d 1133 (D. Colo. 2020); and *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959 (10th Cir. 1996))?

8. Would Iowa adopt the first sale doctrine? *See Allison v. Vintage Sports Plaques*, 136 F.3d 1443, 1448 (11th Cir. 1998) (holding that once the holder of an intellectual property right consents to the sale of particular copies of her work, she no longer has the right to control the distribution with respect to such copies).

(Id.)

According to Exile, these questions are aimed at "clarify[ing] what, if any specific causes of action can and actually did descend to heirs of these Estates through intestate succession." (Id., ¶ 28.) Exile argues that if the Iowa Supreme Court finds in its favor by holding that the probate court should not have reopened Ruthie and Frank's Estates due to lack of jurisdiction or standing, it "should similarly hold that no individual or entity has any legal right to enforce the rights being asserted in this litigation," which would be determinative of this cause of action (in Exile's favor). (Id., ¶ 29.) If the Iowa Supreme Court takes a "piece meal approach," however, and finds that *some* intellectual property could descend through intestate succession, Exile argues the Iowa Supreme Court should "take the next step in the analysis by articulating what [] specific intellectual property rights and corresponding causes of action did descend through intestate succession," which would result in some claims going forward and those that did not descend being dismissed. (Id., ¶ 30.) Exile argues that because the Iowa Supreme Court will have to expend considerable resources in reviewing the probate and civil district court records[9] anyway, asking the Iowa Supreme Court to "continue the analysis of those legal issues and to confirm what impact, if any, its decision has on this litigation serves the interest of judicial economy" by "prevent[ing] duplicative reviews" and "avoid[ing] overlapping and/or inconsistent decisions." (ECF 46-1, pp. 4–5.)

---

[9] Even though the Iowa Supreme Court denied Exile's application for interlocutory appeal of the Civil Order, it permitted several records from the civil proceeding to be included in the appendix for the appeal of the Final Probate Order. (ECF 46-3, p. 7; ECF 46-4, p. 2.)

The Estates resist certification, arguing it is inappropriate for a party who removed an action from state to federal court to turn around and ask for questions to be certified back to the state supreme court. (ECF 49, pp. 3–4.) Additionally, according to Plaintiffs, "[e]ach of these questions . . . were already decided by the Iowa state court, are currently on appeal with the Iowa Supreme Court, were previously declined to be reviewed by Iowa Supreme Court on interlocutory appeal, and are not determinative." (Id., p. 2.)

## II.   LEGAL STANDARDS

The purpose of certification is to "ascertain what the state law is." *Foley v. Argosy Gaming Co.*, 688 N.W.2d 244, 248 (Iowa 2004) (quoting *Tarr v. Manchester Ins. Corp.*, 544 F.2d 14, 15 (1st Cir. 1976)). The Iowa Supreme Court has discretion to answer certified questions if four conditions are met: "(1) a proper court certified the question, (2) the question involves a matter of Iowa law, (3) the question may be determinative of the cause pending in the certifying court, and (4) it appears to the certifying court that there is no controlling Iowa precedent." *Baldwin v. City of Estherville*, 929 N.W.2d 691, 695 (Iowa 2019) (cleaned up); *see also* Iowa Code § 684A.1. The Iowa Supreme Court "may decline to answer the certified questions if the court lacks specific findings of fact or finds the factual record to be unclear." *Life Invs. Ins. Co. of Am. v. Est. of Corrado*, 838 N.W.2d 640, 643–44 (Iowa 2013). Further, the Iowa Supreme Court "should not answer 'questions which admit of one answer under one set of circumstances and a different answer under another, neither of which is inconsistent with the certificate.'" *Id*. at 644 (quoting *Atlas Life Ins. Co. v. W. I. S., Inc.*, 306 U.S. 563, 573 (1939)).

Whether a federal district court should certify a question of state law is a matter of discretion. *Catipovic v. Peoples Cmty. Health Clinic, Inc.*, 239 F. Supp. 2d 917, 922 (N.D. Iowa 2003). However, the Eighth Circuit cautions that "federal courts have a duty to address matters of state law, even when that law is unsettled." *Jung v. Gen. Cas. Co. of Wisconsin*, 651 F.3d 796, 801 (8th Cir. 2011); *see also Anderson v. Hess Corp.*, 649 F.3d 891, 895 (8th Cir. 2011) ("[A]bsent a close question of state law or a lack of state guidance, a federal court should determine all the issues before it."). This is particularly true when the party requesting certification removed the matter to federal court. *See Smith v. SEECO, Inc*., 922 F.3d 406, 412 (8th Cir. 2019) ("[F]ederal courts 'should be slow to honor a request for certification from a party who chose to invoke federal jurisdiction.'" (quoting 17A Charles Alan Wright, Arthur R. Miller et al., Fed. Prac. & Proc. Juris. § 4248 (3d ed. 2017 update))).

In determining whether to grant a motion to certify, some courts have identified the following factors: "(1) the extent to which the legal issue under consideration has been left unsettled by the state courts; (2) the availability of legal resources which would aid the court in coming to a conclusion on the legal issue; (3) the court's familiarity with the pertinent state law; (4) the time demands on the court's docket and the docket of the state supreme court; (5) the frequency that the legal issue in question is likely to recur; and (6) the age of the current litigation and the possible prejudice to the litigants which may result from certification." *Baldwin v. Estherville, Iowa*, 333 F. Supp. 3d 817, 849 (N.D. Iowa 2018); *see also Hagen v. Siouxland Obstetrics & Gynecology, P.C.*, 964 F. Supp. 2d 951, 961 (N.D. Iowa 2013) (indicating a seventh factor may be appropriate, "whether there is any split of authority among those jurisdictions that have considered the issues presented in similar or analogous circumstances."). This Court agrees that these are helpful factors, although it considers them non-exhaustive. As this case illustrates, there are sometimes other facts or circumstances that must be taken into account, including whether the party seeking to certify questions is responsible for choosing the federal forum or whether the state's highest court has previously declined to decide the issues for which certification is sought.

## III.   LEGAL ANALYSIS

### A. *Questions 1 and 2 Are Improper for Certification Because They Would Require the Iowa Supreme Court to Apply Facts to Law.*

Questions 1 and 2 build from the premise that the Iowa Supreme Court will decide the appeal of the Final Probate Order in Exile's favor. Question 1 starts: "If it is determined by the Iowa Supreme Court that the Probate Court had no jurisdiction to reopen these Estates…." (ECF 46, ¶ 1.) Similarly, Question 2 starts: "If it is determined by the Iowa Supreme Court that Huntsman has no standing to reopen these Estates…." (Id., ¶ 2.) Both questions then go on to ask whether, assuming the Estates were improperly reopened, "any individual or entity [has] a legal intellectual property interest that may be pursued through a cause of action filed by or on behalf of" Ruth and/or Frank Bisignano. (Id., ¶¶ 1–2.) These questions are improper for at least three reasons.

First, Iowa law requires certified questions be "determinative of the cause pending in the certifying court." *Baldwin*, 929 N.W.2d at 695; Iowa Code § 684A.1. If the Iowa Supreme Court determines the probate court had jurisdiction to reopen the Estates and/or that Huntsman had standing to reopen the Estates, Questions 1 and 2 are irrelevant. While the Court appreciates the unique procedural posture of this case, a question that has a significant chance of being moot is

not "outcome determinative" in the certification sense. *See Lockhart v. Cedar Rapids Cmty. Sch. Dist.*, 963 F. Supp. 805, 827 (N.D. Iowa 1997) (certifying question that would be "determinative of all of [plaintiff's] remaining claims"), *certified question answered*, 577 N.W.2d 845 (Iowa 1998). These sort of "if/then" hypotheticals are frowned upon. *See Eggers v. Evnen*, No. 4:22-CV-3089, 2022 WL 2118382, at *4 (D. Neb. June 13, 2022), *rev'd and remanded on other grounds*, 48 F.4th 561 (8th Cir. 2022) ("The Secretary wants the Court to ask the Nebraska Supreme Court what *would* happen *if* the 38-county rule is ultimately stricken. That's not an appropriate question to certify, and the Court seriously doubts that the Nebraska Supreme Court would entertain it.")

Second, the thrust of each question—whether *any* individual or entity has a legal intellectual property interest that can be brought by or on behalf of Ruthie and Frank—is a mixed question of law and fact. Certified questions must be purely legal in nature, such that they can be answered by a "pronouncement as to what the law is." *See Eley v. Pizza Hut of Am., Inc.*, 500 N.W.2d 61, 63 (Iowa 1993) (citations omitted). The expectation is that the certifying court will then take the answer—i.e., the now-established principle of law—and apply it to the facts itself, not that it will deputize the Iowa Supreme Court to perform this function. Here, Exile's proposed Questions 1 and 2 essentially ask the Iowa Supreme Court to tell us whether Hunstman or some other hypothetical heir might have the ability to file an action against Exile. The Iowa Supreme Court likely would decline to answer such a question. *See Baldwin*, 929 N.W.2d at 698 (declining to answer certified question that "[i]f the City can assert such a defense . . . does the City have 'all due care' qualified immunity?").

Third, even if the Iowa Supreme Court might be inclined to accept such a certified question, Questions 1 and 2 stretch considerably past the existing factual record, which appears to focus on Huntsman as a surviving heir and not the universe of "any individual or entity" that may have an interest in Ruthie's name. In essence, this Court would be asking the Iowa Supreme Court to issue an advisory opinion on who else besides Huntsman might have standing to bring claims. This is not proper. *See Mehlenbacher v. Akzo Nobel Salt, Inc.*, 216 F.3d 291, 300 (2d Cir. 2000) (declining to certify questions where answers would affect plaintiffs that were not before the court); *Est. of Corrado*, 838 N.W.2d at 643–44 (questions may be declined where the court "lacks specific findings of fact" or the "factual record [is] unclear"); *see also YWS Architects, LLC v. Alon Las Vegas Resort, LLC*, No. 217CV01417RFBVCF, 2018 WL 4615983, at *5 (D. Nev. Sept. 26, 2018) (motion to certify questions was premature prior to the submission of evidence with dispositive

motions). Exile's Motion to Certify is therefore DENIED as to Questions 1 and 2 without even considering issues surrounding the timing of Exile's Motion.

  B.  *Questions 3, 4, and 5 Are Not Appropriate for Certification for Many Reasons, Including, Especially, the Timing of Exile's Motion to Certify.*

Exile's proposed Question 3 has four subparts asking if the Iowa Supreme Court would recognize causes of action for appropriation of name and/or likeness (Count I), right of publicity (Count II), misappropriation of trade values (Count III), and deceptive marketing (Count V). (ECF 46, ¶ 3.) If so, in Questions 4 and 5, Exile proposes to ask the Iowa Supreme Court to clarify the elements applicable to each cause of action and their statute of limitations. (Id., ¶¶ 4–5.) These appear to be purely legal questions of the type appropriate for certification. Nonetheless, the Court has significant concerns about the timing and sequence of events that led to Exile's motion to certify them.

First, there is something unsettling about certifying questions to a state's highest court at the request of a party who unilaterally chose to remove the case from state court in the first place. *See Smith*, 922 F.3d at 412. Exile had full control over whether the Iowa Supreme Court would have the final word on the viability of Plaintiffs' causes of action. It nonetheless chose removal. The Court is hesitant to save Exile from the consequences of that choice. *See id.*; *Jung*, 651 F.3d at 801 (denying certification request by party made two years after that party removed action and suffered adverse ruling).

Moreover, the timing and sequence of events raises doubts about the sincerity of Exile's purported interest in efficiency. When Exile removed the case to this Court on April 8, 2022, the parties did not yet have a briefing schedule from the Iowa Supreme Court for the appeal from the Final Probate Order. Given the Iowa Supreme Court's publicly-available calendar, however, it was clear the case would not be fully-briefed and heard until well into the 2022–23 term. If Exile was truly interested in efficiency, it could have—and should have—moved to certify shortly after removal to this Court, as this would have given the Iowa Supreme Court the opportunity to fold certified questions into the appeal from the Final Probate Order. But Exile did nothing.

It was not until nine months later, on January 11, 2023, that Exile finally filed its Motion to Certify. By this point, the appeal from the Final Probate Order was already fully briefed and placed on the Iowa Supreme Court's oral argument calendar for March 2023. Accordingly, Exile surely knew there was no realistic chance of the Iowa Supreme Court considering the certified questions at the same time as the appeal from the probate case. Instead, Exile's timing all but

guaranteed the Iowa Supreme Court could not decide any certified questions until the 2023–24 term. This, in turn, would make it impossible for the Court and parties to bring this case to trial in January 2024, as scheduled. Indeed, if questions are certified, it is highly unlikely trial would occur before 2025. *See Hagen*, 964 F. Supp. 2d at 977 (estimating one-year delay for certification process).

The Court does not know whether Exile's timing was part of a deliberate, tactical strategy to delay the case or simply a function of inertia. Either way, the timing weighs heavily against Exile's Motion to Certify. *See Saunders v. Thies*, 38 F.4th 701, 716 (8th Cir. 2022). The Court likely would deny the Motion to Certify as to Questions 3 through 5 based solely on the combination of timing and Exile's decision to remove to federal court in the first place. Nonetheless, in the interest of being thorough, the Court will consider other factors that are sometimes used to evaluate whether questions should be certified. Most are either neutral or weigh against certification. None weighs so strongly in favor of certification to overcome the problems created by Exile's decisions to remove to federal court and wait to file a Motion to Certify until nine months later.

Three of the factors identified in *Baldwin* essentially revolve around this Court's ability to decide the questions of state law. *See Baldwin*, 333 F. Supp. 3d at 849 ("(1) [T]he extent to which the legal issue under consideration has been left unsettled by the state courts; (2) the availability of legal resources which would aid the court in coming to a conclusion on the legal issue; (3) the court's familiarity with the pertinent state law…"). The Court is comfortable that there is sufficient guidance from existing precedent to allow it to do so here. For example, Counts I, II, III, and V all appear to be species of the right to privacy. Iowa recognizes a common law action for invasion of privacy and has adopted the Restatement (Second) of Torts. *Howard v. Des Moines Reg. & Trib. Co.*, 283 N.W.2d 289, 291 (Iowa 1979). Pursuant to the Restatement, Iowa law recognizes that the right of privacy is invaded by: (a) unreasonable intrusion upon the seclusion of another; (b) appropriation of the other's name or likeness; (c) unreasonable publicity given to the other's private life; or (d) publicity that unreasonably places the other in a false light before the public. *Stessman v. Am. Black Hawk Broad. Co.*, 416 N.W.2d 685, 686–87 (Iowa 1987).

The Iowa Supreme Court has expressly adopted a cause of action for Plaintiffs' Count I, appropriation of name or likeness. *See Stessman*, 416 N.W.2d at 686. Neither the Iowa Supreme Court nor the Iowa legislature have recognized (or rejected) a cause of action for Count II, right of

publicity, despite much discussion on the topic.[10] Nonetheless, the tort has been gaining popularity in recent years, with at least thirty states now recognizing it. *See* Rachel B. Zingg, *Lights, Camera, Cause of Action: Bringing A Right of Publicity Statute to Iowa That Balances First Amendment Concerns*, 108 IOWA L. REV. 505, 518 (2022). The Northern District of Iowa (Melloy, C.J.) predicted the Iowa Supreme Court would adopt a "right of publicity claim" over twenty years ago, although the question has never reached the Iowa Supreme Court itself. *See Sharp-Richardson v. Boyds Collection, Ltd.*, No. C 96-0344 MJM, 1999 WL 33656875, at *15 (N.D. Iowa Sept. 30, 1999). This Court is confident it can review Iowa's long history of invasion of privacy law to determine if the Iowa Supreme Court would adopt such a claim. *See Thompson v. Harrie*, --- F.4th ----, 2023 WL 1492450, at *2 (8th Cir. Feb. 3, 2023) (district courts may consider "relevant precedent, analogous decisions, considered dicta, and any other reliable data" in predicting how state supreme court would rule); *see also Lehman Bros. v. Schein*, 416 U.S. 386, 390 (1974) ("[M]ere difficulty in ascertaining local law is no excuse" for certifying questions.).

Count III, misappropriation of trade values (of Ruthie's right to publicity), has not been expressly adopted in Iowa, either. The cause of action stems from *International News Service v. Associated Press*, 248 U.S. 215 (1918) and was carried forward in Section 38 of the Restatement (Third) of Unfair Competition. The Iowa Supreme Court has not cited *Int'l News Serv.* or expressly adopted Section 38 (or its relevant companions, Sections 46–49), but it has relied on the Restatement (Third) of Unfair Competition in other contexts. *See, e.g.*, *Cemen Tech, Inc. v. Three D Indus., L.L.C.*, 753 N.W.2d 1 (Iowa 2008); *Cmty. State Bank, Nat. Ass'n v. Cmty. State Bank*, 758 N.W.2d 520 (Iowa 2008); *Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751 (Iowa 1999); *Com. Sav. Bank v. Hawkeye Fed. Sav. Bank*, 592 N.W.2d 321 (Iowa 1999). The Eighth Circuit instructs that district courts are to "pay particular attention to sources cited approvingly by the state's highest court" in predicting how they would rule. *See Holbein v. TAW Enterprises, Inc.*, 983 F.3d 1049, 1061 (8th Cir. 2020) (citation omitted). This includes Restatements of Law. *See Gilstrap v. Amtrak*, 998 F.2d 559, 560 (8th Cir. 1993). As with Count II, the Court concludes there is sufficient guidance available under Iowa law to determine whether the Iowa Supreme Court

---

[10] *See* Rachel B. Zingg, *Lights, Camera, Cause of Action: Bringing A Right of Publicity Statute to Iowa That Balances First Amendment Concerns*, 108 IOWA L. REV. 505 (2022); Nanci K. Carr, *Protecting the Commercial Value of Iowans' Identity Nationwide: A Response to Colon's Proposed State Statute*, 106 IOWA L. REV. ONLINE 1 (2021); Madison J. Murhammer Colon, *How Can Iowans Effectively Prevent the Commercial Misappropriation of Their Identities? Why Iowa Needs A Right of Publicity Statute*, 106 IOWA L. REV. 411 (2020).

would adopt a misappropriation of trade values claim. *See S. Glazer's Wine & Spirits, LLC v. Harrington*, 594 F. Supp. 3d 1108, 1125–26 (D. Minn. 2022), *appeal dismissed*, No. 22-1936, 2022 WL 16639334 (8th Cir. May 5, 2022) ("Certification is not a procedure by which federal courts may abdicate their responsibility to decide a legal issue when the relevant sources of state law available to it provide a discernible path for the court to follow." (citation omitted)).

Finally, the Iowa Supreme Court also has not decided the viability of Count V, deceptive marketing of another's name, likeness, or other indicia of identity. As with Count III, however, this cause of action derives from Section 38 of the Restatement (Third) of Unfair Competition. Again, while the Iowa Supreme Court has embraced the Restatement generally, it has not adopted Section 38 or Sections 46–49. Still, this Court is capable of applying Iowa's existing tort law to determine if the Iowa Supreme Court would recognize a cause of action for Count V. *See Jung*, 651 F.3d at 801 ("[F]ederal courts have a duty to address matters of state law, even when that law is unsettled."); *Saunders*, 38 F.4th at 716 (certifying a question "is by no means obligatory" (quoting *McKesson v. Doe*, 141 S. Ct. 48, 51 (2020))).

The Court next examines whether the legal issues are likely to recur. *Baldwin*, 333 F. Supp. 3d at 849. There is evidence pointing in both directions. On one hand, the Iowa Supreme Court recognized the viability of a common-law tort claim for invasion of privacy almost seventy years ago. *See Bremmer v. Journal-Tribune Pub. Co.*, 76 N.W.2d 762 (Iowa 1956). The fact that the Iowa Supreme Court has not subsequently decided the viability of claims for misappropriation of trade values, right of publicity, or deceptive marketing suggests the citizenry is not clamoring for a decision on those topics. In other words, the present case may be a "one-off" rather than part of a wave. *See Zimmer v. Travelers Ins. Co.*, 454 F. Supp. 2d 839, 861 (S.D. Iowa 2006) (declining to certify questions where case had already been pending for two years and certification would only "needlessly protract" the litigation to resolve an issue that was "unlikely to recur with any real frequency").

On the other hand, Exile credibly argues that the Iowa Legislature's recent enactment of a bill allowing student athletes to be compensated for "name, image, and likeness" and the "increased use of social media and 'deepfake' technology" makes it more likely that right of publicity questions will arise in the future. (ECF 46-1, p. 6.) On balance, the Court concludes this factor is neutral.

In sum, some factors weigh heavily against certification of Questions 3 through 5. Others are neutral. Collectively, then, the Court DENIES Exile's Motion to Certify as to those Questions.

C. *The Court Declines to Certify Questions 6, 7, and 8.*

Exile's proposed Questions 6, 7, and 8 seek to take the Iowa Supreme Court's temperature on potential defenses. Question 6 asks whether the Iowa Supreme Court would adopt the "re-publication interpretation of the continuous tort doctrine." (ECF 46, ¶ 6.) Question 7 asks about the "*Stouffer* six factor test to determine whether the speech at issue is expressive." (Id., ¶ 7.) Question 8 asks about adoption of the "first sale doctrine." (Id., ¶ 8.)

The Court expressed above its hesitation to certify questions at the request of a party who unilaterally chose to remove the case to federal court in the first place, then waited nine months to move for certification. Those concerns apply with equal force to Exile's proposed Questions 6 through 8 and are reason enough to deny the Motion to Certify as to those Questions. Questions 6 through 8 also, however, suffer from other problems that make them inappropriate for certification.

First, Exile's briefing on the Motion to Certify gave very little attention to the issues raised in Questions 6 through 8, which Exile admits have not been given significant attention in the litigation to this point. In Exile's own words, "[s]everal of Exile's defenses, such as the statute of limitations defense, re-publication interpretation, *Stouffer* six factor test, and the first sale doctrine have not yet been presented to the state district court or this court because expert deadlines have not yet lapsed, discovery has not closed, and the deadline for filing motions for summary judgment has never lapsed." (ECF 52, pp. 4–5.) In context, Exile arguably just threw in Questions 6 through 8 as an afterthought.

Iowa law requires certified questions to be "determinative of the cause pending in the certifying court." *Baldwin*, 929 N.W.2d at 695; Iowa Code § 684A.1. It is unclear whether Questions 6 through 8 satisfy this requirement. Moreover, even if they <u>could</u> be determinative, the absence of factual development makes it difficult to view them as more than hypothetical at this point. "No matter how appealing it might be . . . [c]ertification is not warranted for merely hypothetical questions." *Shirazi v. Childtime Learning Ctr., Inc.*, No. CIV-07-1289-C, 2008 WL 508088, at *1 (W.D. Okla. Feb. 22, 2008); *see also In re McNeilus Mfg. Explosion Coordinated Litig.*, 381 F. Supp. 3d 1075, 1080 (D. Minn. 2019) (declining to certify question premised on hypothetical finding that defendants were less than 50% at fault); *Benson v. Double Down Interactive, LLC*, No. 2:18-CV-00525-RBL, 2020 WL 4607566, at *3 (W.D. Wash. Aug. 11, 2020)

("Double Down's hypothetical about a player who never depleted their chips before buying more may never become relevant in this case and therefore does not warrant certification."). For these reasons, among others, Exile's Motion to Certify is DENIED as to Questions 6, 7, and 8.

## IV.    CONCLUSION

Exile's Motion to Certify is DENIED. (ECF 46.) As the Court discussed with the parties at the hearing on Exile's motion, the following deadlines are extended as follows:

- ▪  Plaintiffs' Rebuttal Expert Witness Disclosures: April 17, 2023
- ▪  Discovery Deadline: May 26, 2023
- ▪  Dispositive Motion Deadline: June 26, 2023

The final pretrial conference remains scheduled for December 6, 2023, and trial remains scheduled for January 16, 2024.


IT IS SO ORDERED.

Dated: February 24, 2023

_____
STEPHEN H. LOCHER
U.S. DISTRICT JUDGE