IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| ESTATE OF RUTH C. BISIGNANO, by and through its administrator, FRED HUNTSMAN; and ESTATE OF FRANK BISIGNANO, as successor in interest to RUTH C. BISIGNANO, by and through its administrator, FRED HUNTSMAN, <br><br> Plaintiffs, <br><br> vs. <br><br> EXILE BREWING COMPANY, LLC, <br><br> Defendant. | 4:22-cv-00121-SHL-SBJ <br><br><br><br> **ORDER GRANTING IN PART AND DENYING IN PART CROSS MOTIONS FOR SUMMARY JUDGMENT** |

## I.  INTRODUCTION.

Nearly twenty years after Ruthie Bisignano died, Defendant Exile Brewing Company, LLC ("Exile") began using her name and likeness for marketing purposes. Exile argues that, by that time, any statutory or common law rights Ruthie or her heirs might have possessed in her name and likeness had long since expired or been abandoned. The Court agrees in part and disagrees in part. It concludes that Ruthie's Estate does not have a viable claim under the federal Lanham Act but is entitled to a jury trial on common law right-of-publicity and similar claims under Iowa law.

## II.  FACTUAL AND PROCEDURAL BACKGROUND.

### A.  Preliminary Issue: Admissibility of Newspaper Articles Regarding Ruthie.

Much of the parties' understanding of Ruthie's life is based on newspaper articles from the 1950s. (See, e.g., ECF 119-1, ¶ 15; ECF 104-3, ¶ 46.) The Estates submitted forty-seven articles in support of their motion for partial summary judgment on the Lanham Act claim. (ECF 104-3, ¶ 2 (citing ECF 90-3, pp. 113–62).) Exile characterizes these newspaper clippings as "rank hearsay" (id., p. 3) and persistently objects to the Estates' reliance on them in their statements of fact (e.g., id., ¶¶ 1–2; ECF 124, ¶¶ 1–6). As the substance of the articles is relevant in many ways to the pending motions, the Court will address Exile's objection before discussing the facts.

Generally speaking, newspaper articles are hearsay and cannot be considered by the Court in determining whether there are genuine disputes of material fact. *See Crews v. Monarch Fire Prot. Dist.*, 771 F.3d 1085, 1092 (8th Cir. 2014) (citing Fed. R. Civ. P. 56(a)). There are exceptions

to this rule. The first—not really an exception at all—applies when the articles are not being offered for the truth of the statements contained therein. Fed. R. Evid. 801(c)(2); *see Schickel v. Dilger*, 925 F.3d 858, 872 n.1 (6th Cir. 2019) (admissible for evidence of current events and their effect on a third party); *Lyons P'ship, L.P. v. Morris Costumes, Inc*., 243 F.3d 789, 804 (4th Cir. 2001) (admissible for evidence of children's and reporters' reactions). The second exception applies when a party, through its conduct, manifests its adoption or belief of the article's truth. Fed. R. Evid. 801(d)(2)(B); *see Wagstaff v. Protective Apparel Corp. of Am*., 760 F.2d 1074, 1078 (10th Cir. 1985) (articles were admissible where defendants "reprint[ed] the newspaper articles and distribut[ed] them to persons with whom defendants were doing business" thereby "unequivocally manifest[ing] their adoption of the inflated statements made in the newspaper articles"). The third exception applies when the newspaper article "is supported by sufficient guarantees of trustworthiness" and is "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts," which places it within the residual exception to the hearsay rule. Fed. R. Evid. 807; *see In re Columbia Sec. Litig*., 155 F.R.D. 466, 478–79 (S.D.N.Y. 1994) (admitting news article under residual exception); *see also Ciarlone v. City of Reading*, 489 F. App'x 567, 570 (3d Cir. 2012) (considering but ultimately rejecting residual exception where articles were published two-and-a-half years after incident).

One or more of these exceptions is generally applicable here. <u>First</u>, many of the articles are not being used for their truth, but rather to demonstrate then-current events, including whether Ruthie was famous and why. When used for this purpose, the articles are not hearsay. Fed. R. Evid. 801(c)(2); *see also Schickel*, 925 F.3d at 872 n.1. <u>Second</u>, the articles are often admissible as statements of a party opponent. Fed. R. Evid. 801(d)(2)(B). In the eight years preceding this litigation, Exile repeatedly manifested its belief in the articles by posting them to its social media accounts and displaying them at its Brewpub. (See, e.g., ECF 90-3, p. 265 (sharing a 1953 Rave article on Instagram with the caption, "Ruthie Fontanini,[1] buxom operator of Ruthie's Lounge in Des Moines, Iowa, delights customers with her beer-pouring ability."); id., pp. 267–68 (sharing a 1956 San Mateo Times article on Facebook with the caption, "We had heard rumors about Ruthie and taxes, but now we know it's true!"); id., p. 288 (sharing a 1953 Charleville Times article with the tweet, "We always knew Ruthie was famous on a national level but we've found a couple things that prove her fame on an international scale!"); id., p. 291 (sharing a picture of a framed

---

[1] This was Ruthie's former name from a previous marriage.

copy of an original 1976 article with the tweet, "Next time you visit the brewery check out the articles and pictures of Ruthie on our wall downstairs!").) In fact, the events recalled in those articles have made their way, literally, onto the side of Exile's products. (See, e.g., ECF 119-1, ¶ 53(d) (a label of Exile's Ruthie beer bottle begins, "In 1953, 23 year old Ruthie opened her lounge in Des Moines . . . ."); id., ¶ 53(a) (on a Ruthie can, stating "the tips [Ruthie] made were so exorbitant that they tried to impose a burlesque tax on her"); id., ¶ 53(c) (on a Ruthie can, "[h]er unique serving style became so renowned a Hollywood star advised her to raise her prices and soon she was selling drafts for three times the standard rate").) Even in this litigation, Exile occasionally uses the articles to establish facts. (See, e.g., ECF 112-2, ¶ 5 (Exile's fact that "[b]ased on these articles, Ruth 'dropped out of sight' in the mid 1950's.").) This is more than enough to classify the articles as adoptive statements. See *Wagstaff*, 760 F.2d at 1078.

Third, in light of the above facts, the Court cannot credit Exile's newfound cynicism toward the articles. *See Segal v. Metro. Council*, 29 F.4th 399, 403 (8th Cir. 2022) (genuine disputes must be substantiated with probative evidence). Instead, since Exile does not credibly dispute the facts within the articles, the Court would consider them for the truth of the matter asserted under the residual hearsay exception. Most of the articles were written contemporaneously with the events in question and are consistent with one another as to pertinent facts. (ECF 104-3, ¶ 2 (forty-three of forty-seven articles were written in the 1950s and described Ruthie's bar trick, business, court battles, and divorces).) The timing and consistency help provide "sufficient guarantees of trustworthiness." Fed. R. Evid. 807(a)(1); *see Hicks v. Charles Pfizer & Co. Inc.*, 466 F. Supp. 2d 799, 808–09 (E.D. Tex. 2005) (admitting articles from the 1960s that were consistent and written "long before any motive to fabricate arose"). Additionally, and equally importantly, the articles are "more probative on the point[s] for which [they are] offered than any other evidence that [the Estates] can obtain through reasonable efforts." Fed. R. Evid. 807(a)(2). Since the events in question occurred seventy years ago, first-hand witnesses are almost certainly unavailable. Newspaper articles and photographs are therefore among the best evidence of Ruthie's life, particularly when the objecting party has built a brand out of them.

The Court's determination that the newspaper articles are generally admissible is subject to a few specific objections, discussed where relevant below.

B. *Undisputed Facts.*[2]

1. The 1950s: Ruthie's Popularity.

The following facts are either undisputed or, where genuinely disputed, interpreted in the light most favorable to the non-moving party. *Smith v. Ashland, Inc*., 250 F.3d 1167, 1171 (8th Cir. 2001). This litigation centers around the name and likeness of Ceva Ruth-Lucille Bisignano, known professionally as "Ruthie." *See Est. of Bisignano v. Exile Brewing Co., LLC*, No. 422CV00121SHLSBJ, 2023 WL 3479173, at *1 (S.D. Iowa Feb. 24, 2023). In the 1950s, Ruthie owned and operated Ruthie's Lounge in Des Moines, Iowa. *Id*. At the Lounge, Ruthie performed a bar trick of "filling two pint glasses while balancing them on her breasts and serving them without ever touching them with her hands." *Id*. She kept a sign on her wall promoting her stunt, telling patrons to "[a]sk for the well balanced beer." (ECF 124, ¶ 3.) Ruthie attracted the attention of various news outlets, with at least forty-seven articles written about her between 1952 and 1996. (ECF 104-3, ¶ 2.) These articles are the subject of considerable disagreement between the parties.

The Estates claim the articles establish that Ruthie "became famous" in the 1950s for her bar trick. (ECF 124, ¶ 2.) Exile disputes that Ruthie was famous at all or that any recognition she did have was linked to her bar ownership or bar trick. (ECF 104-3, ¶ 2.) This much, however, is clearly true: of the forty-seven articles in the record, forty-three were written in the 1950s. (Id.) Thirty-two of the articles were published in Iowa and fifteen were published elsewhere, including: New York (3), California (1), Minnesota (1), Florida (1), Arizona (2), Mississippi (1), Alabama (1), Indiana (2), Wisconsin (1), Tennessee (1), and Australia (1). (Id.) Twenty-three articles reference Ruthie's marital issues, particularly her divorce proceedings and the impact those proceedings had on her lounge ownership. (Id.)

It is similarly beyond dispute that many of the articles reference Ruthie's balancing act, with the earliest such reference appearing on May 4, 1953, when an article reported that Ruthie was charged with obscenity for "balanc[ing] a glass on her bosom and then pour[ing] beer into the glass from a bottle." (ECF 90-3, p. 115.) Clippings from around this time include pictures showing what purports to be Ruthie pouring beer while balancing two glasses on her breasts. (Id., pp. 119–20.) Newspapers followed the obscenity story, culminating with Ruthie being cleared of the charge

---

[2] The parties' summary judgment filings included seven separate documents containing statements of fact. (ECF 104-3, 112-2, 113-2, 114-2, 116-2 (Responses to Statements of Fact); ECF 119-1, 124 (Responses to Additional Statements of Fact).) Except where context requires otherwise, the Court will only cite to one document for each fact.

in June 1953. (Id., pp. 118–20.) Approximately one month later, Ruthie was arrested again for the same conduct. (Id., p. 122.) She was again cleared following a colorful hearing that made the news and included extended discussion of her "stunt." (Id., pp. 123–26.) A few years later, in May 1956, Ruthie was back in the public eye when the Internal Revenue Service levied a $44,694 tax lien against her (and others) for back taxes, claiming her trick classified as "entertainment." (Id., pp. 151–55.)

Some of these articles expressly say that Ruthie was "famous," which draws objections from Exile that the articles are not just hearsay, but also improper expert opinions. (Id., p. 137 (calling Ruthie's Lounge "Des Moines' most famous tavern" and stating it "became known because of Ruthie's agility in balancing four beer steins on her bosom"); id., p. 157 (stating that "[i]n her heyday, Ruthie gained national notoriety for her ability to balance glasses of beer on her bosom"); id. p. 159 (saying Ruthie "misses the tavern business and the days when she was famous for delivering glasses of beer balanced on her breasts – a feat which earned her space in 17 magazines and newspapers across the country and Stars and Stripes overseas"); id., p. 161 (reporting Ruthie's death, "a one-time Des Moines barkeeper and legend in her own time" and describing how she "gained fame" through her bar trick); id., p. 162 (recalling that "Ruthie lured more visitors to Des Moines than any other individual" and that in her time, she appeared in "newspapers and magazines around the world"); ECF 104-3, p. 7.) The Court overrules the objections. The articles' use of the word "famous" (or variations thereof) does not change the Court's conclusion, described above, that they are admissible for both hearsay and non-hearsay reasons. Moreover, and in any event, whether the articles describe Ruthie as "famous" is not material to the Court's rulings.

2. The 1990s: Ruthie's Death.

Between 1957 and 1976, newspapers stopped reporting on Ruthie, ostensibly because she chose to "drop[] out of sight" and live a private life. (ECF 112-2, ¶¶ 5–6.) The Estates assert that she was married to Frank Bisignano until her death in 1993, relying on an affidavit submitted by heir Fred Huntsman. (ECF 104-3, ¶ 4.) Exile disputes this, offering various objections to the affidavit and implying that since Ruthie herself claimed to be married "16 times" to "nine different men," her purported marriage to Frank may have been invalid. (Id. (citing ECF 90-3, p. 158).)[3]

---

[3] Exile appears to concede Frank's marriage to Ruthie in some places. (ECF 116-2, ¶ 18; ECF 114-2, ¶ 13.) Nonetheless, in an abundance of caution, the Court will assume it is disputed here.

Exile provides no evidence supporting its position beyond Ruthie's vague statements (ECF 104-3, ¶ 4), none of which *per se* undermine the asserted fact that she was married to Frank for many years until her death. The asserted fact is further supported by other evidence, including newspaper interviews in 1976 and 1988 in which Ruthie said she was married to Frank and had been since 1960. (ECF 90-3, pp. 158–59.) In addition, Ruthie purported to reside at 318 East Dunham Street (id., pp. 159, 161), which is a house Frank later said they shared at the time of her death (id., p. 45). When Ruthie died in 1993, Frank administered her estate and swore he was Ruthie's husband and only heir. (Id., pp. 43–47.) Exile has not created a genuine dispute on whether Ruthie was married to Frank, nor would such a dispute be material anyway.

Ruthie's Estate was closed the same year she died, and it is undisputed that the final inventory did not list her name, image, or likeness as an asset. (ECF 116-2, ¶¶ 17–19.) It is similarly undisputed that the "receipt" Frank filed in the probate proceeding stated that "no other money or property is payable or deliverable to the undersigned from the fiduciary as share, legacy, claim, allowance, fees, rentals, proceeds of life insurance, joint tenancy property, survivorship property, documents of ownership, title or transfer, abstracts, fire insurance policies or other right or interest in or to said estate, due or to become due or deliverable from the above entitled estate or from the fiduciary or otherwise." (Id., ¶ 23.)

Frank died in 1996 and his estate was closed in 1999. (Id., ¶ 24.) His estate was administered by Andrea Huntsman, his niece. (ECF 90-3, p. 102.) He had three surviving heirs: Barbara Hamand (sister), Alfonso Bisignano (brother), and Rose Medici (sister). (Id., p. 103.) His final inventory did not list Ruthie's name, image, or likeness as an asset. (ECF 114-2, ¶ 17.) Since the original heirs to Frank's estate are now deceased, the Estates have identified five "surviving heirs": Fred Huntsman, Mary Kay Madden, Michelle Mahlstadt, Tony Bisignano, and Toni Griggs. (ECF 116-2, ¶ 26.) Huntsman is Frank Bisignano's nephew and has lived in Washington state since 1984. (Id., ¶ 27; ECF 83-3, p. 147.) The other heirs are Frank's nieces and nephew and have resided in or near Des Moines at all relevant times, with one possible exception.[4] (ECF 116-2, ¶ 28; ECF 83-3, p. 147.)

The Estates do not genuinely dispute that between 1993 and 2020, nobody engaged in commercial activity on behalf of Ruthie's or Frank's Estates (collectively, the "Estates") or were otherwise compensated for Ruthie's name, image, or likeness. (ECF 112-2, ¶ 8; ECF 113-2, ¶ 10;

---

[4] Toni Griggs is incapacitated, and it is unclear where she resides. (ECF 116-2, ¶ 26 n.3.)

ECF 119-1, ¶ 61.) Exile therefore claims that Ruthie was no longer "famous" as of 2011, the year prior to when Exile began using her name and likeness. (ECF 114-2, ¶ 30 (citing ECF 83-3, p. 227, Tursi's testimony she was "forgotten").) The Estates disagree, pointing to modern publications that they argue demonstrate the ongoing viability of Ruthie's story. (Id.) For instance, in George Mills's 1991 book *Looking in Windows*, Mills described Ruthie as enjoying "world fame" for her bar trick and purported to corroborate that claim by recounting her famous visitors, nightly profits, and the extent of her press coverage ("coast to coast, in foreign countries and seventeen magazines"). (ECF 90-3, pp. 187–88.)[5] In Bill Bryson's 2006 memoir *The Life and Times of the Thunderbolt Kid*, Bryson recalls Ruthie's glory days during his childhood in Des Moines. (Id., pp. 191–92.) Most recently, in Darcy Dougherty-Maulsby's 2020 book *Classic Restaurants of Des Moines and Their Recipes*, Dougherty-Maulsby referred to Ruthie as a "celebrity" of the 1950s and quoted the then-current chairman of the Business Publications in Des Moines as remembering Ruthie's business acumen to the present day. (Id., p. 199.) In the remainder of Dougherty-Maulsby's book, there are additional references to Ruthie that cover similar ground as the earlier newspaper articles, with one addition: the book credits Exile for having "brought Ruthie's story back into the local spotlight nearly fifty years after Ruthie's Lounge shut its doors." (Id., p. 202.) The book makes this statement primarily based on a 2019 article from the *Vice* website. (Id.)

In addition to these more modern publications, it is undisputed that a handful of Des Moines-area businesses displayed Ruthie's picture after her death. For instance, the parties agree that her photograph hung in The Tavern and Chuck's Restaurant. (ECF 114-2, ¶¶ 60, 62.) It is similarly undisputed that a group of retirees visited Exile's Brewpub in 2013 and purported to know or remember Ruthie, her trick, and her alleged "fame." (ECF 90-3, pp. 166–69.)

### 3. 2012: Exile Opens its Brewpub and Begins Selling "Ruthie" Beer.

In 2012, Exile opened a brewery and brew pub in Des Moines and modeled its flagship lager after "Ruthie," complete with a logo of a "barmaid balancing beer on her bosom." (ECF 112-2, ¶¶ 13, 24–25.) According to an article published in 2013 and based on quotes from R.J. Tursi, one of Exile's owners, "Tursi dug up [Ruthie's] story a year ago when he decided to name all of Exile's beers after women to give the brews personality." (ECF 90-3, pp. 166–69.) Tursi is quoted

---

[5] Exile objects to the admissibility of these publications for the same reasons as the newspaper articles—that they are hearsay and amount to improper expert opinions. (See, e.g., ECF 124, ¶ 1.) The Court rejects those arguments for the reasons stated above.

as saying, "We pair the beer with the style of people. Ruthie had this mass appeal. And this beer is not light bodied; it's got body and character and flavor to it." (Id., p. 167.)[6] The article includes a picture of Tursi at the Brewpub, holding a framed portrait of Ruthie from the 1950s. (Id., p. 168.)

    The parties dispute whether and to what extent Exile searched for heirs or others with a potential interest in Ruthie's name, image, or likeness before using her name for its beer. (ECF 112-2, ¶¶ 18–21.) The parties also dispute whether, and to what extent, Exile interacted with Ruthie's heirs after the beer was released. (Id., ¶ 29.) At minimum, it is undisputed that Frank's heir Tony Bisignano interacted with an Exile employee serving Ruthie beer at a festival in July 2013 and indicated he was Ruthie's nephew. (ECF 114-2, ¶¶ 45–47.) The same day, Exile shared a picture on Facebook of Tony Bisignano pouring a Ruthie beer. (ECF 83-3, p. 247.)[7]

    Tony Bisignano is not the only one of Ruthie's heirs who has known for many years of Exile's use of her name and likeness. Huntsman testified that he first became aware of it from his sister, Andrea, in 2014. (ECF 114-2, ¶ 48.) In 2015, Huntsman responded to a photograph posted to Flickr of one of Exile's "Ruthie" advertisements, describing it as a "[n]ice tip of the hat to Ruthie!" (Id., ¶¶ 50–52.)[8] In June 2017, Huntsman posted a photograph of Ruthie to his Facebook with the caption: "I don't think my Des Moines friends need an introduction to this lady. But, for everyone else this is a photo of My Aunt Ruth who lived a pretty colorful life. The particular skill that you see her displaying here, earned her worldwide recognition." (Id., ¶ 56.) When another individual commented that "Exhale (sic.) Brewery" named a beer after her, Huntsman replied with a picture of Exile's "Ruthie" tap handle. (Id., ¶ 57; ECF 83-3, p. 253.) In August 2019, Tony Bisignano posted a picture of himself standing in front of Exile's "Ruthie" logo at the Iowa State Fair, along with the caption, "My Aunt Ruthie!" (ECF 114-2, ¶¶ 68–69.) Huntsman said, "They say the nephew's a chip off the ol' auntie block!" (Id., ¶ 70.) He later reposted the picture to his own Facebook page with the caption, "My cousin Tony Having a Ruthie At the Iowa State Fair." (Id., ¶ 71.)

---

[6] Exile argues that Tursi's statement is inadmissible hearsay and an improper expert opinion. (ECF 124, ¶ 14.) This is a frivolous objection, as Tursi's statement is admissible as a statement by party opponent given his position as one of Exile's owners. *See* Fed. R. Evid. 801(d)(2).

[7] The Estates argue the Facebook post is inadmissible hearsay. (ECF 114-2, ¶ 47.) As with the newspaper articles, the Facebook post is not being offered for the truth of the matter asserted and is instead admissible for the non-hearsay purpose of showing that Tony was aware of Exile's Ruthie beer in 2013. Fed. R. Evid. 801(c)(2).

[8] The Estates argue the Flickr post lacks foundation and is inadmissible hearsay. (ECF 114-2, ¶¶ 50–52.) As with the Facebook post, the Court concludes the post is admissible to show Huntsman's knowledge in 2015.

4.  <u>2016: Exile's Rebranding of "Ruthie."</u>

From 2012 to 2016, Exile's Ruthie beer had the following logo:



Ruthie

(ECF 124, ¶ 13.) In an interview in 2019, Tursi described the original logo as "pin-up look." (ECF 90-3, p. 179.) The logo did not expressly reference Ruthie as a real person. (ECF 124, ¶¶ 23–24.) Tursi testified that this was intentional, as it was possible "somebody might come out of the woodwork" to assert rights over Ruthie's name, image, or likeness. (Id., ¶ 25.) All the same, Tursi said that some customers would ask about the basis for the caricature, and Exile's servers would respond by telling Ruthie's story. (Id.) While the initial logo was in use, Exile sold draft Ruthie beer in its Brewpub, sold Ruthie kegs to bars and restaurants, and sold single and six-pack Ruthie beer bottles. (Id., ¶ 26.)

In mid-2016, Exile hired an independent artist to overhaul its "Ruthie" logo. (Id., ¶ 27; ECF 114-2, ¶ 53.) Tursi said the original look was "too posed," and Exile wanted to re-brand to connect better with blue-collar customers. (ECF 124, ¶¶ 28–29.) Tursi also testified that Exile wanted to "lean[] more into Ruthie's story" after Ruthie's relatives purportedly told the company that Ruthie would have appreciated the tribute. (Id., ¶ 29.) Using old newspaper clippings and photos, the artist created the following logo that Exile has been using since mid-2016:



(Id., ¶ 30.) The image was designed to draw on Ruthie's reputation as a "confident, independent, powerful female bartender." (ECF 113-2, ¶ 16.)

Exile's business grew during this period. In December 2016, Exile sold its first tap handles with the new "Ruthie" logo. (ECF 124, ¶ 33.) In May 2017, Exile sold Ruthie beer cans for the first time, which included a snippet about Ruthie the person. (Id., ¶¶ 35, 44.) In 2019, Exile secured sponsorships with the Iowa Wild professional hockey team and the Iowa State Fair to advertise Ruthie to hockey fans and fairgoers. (Id., ¶¶ 36–38.) At the state fair, a reporter for *Vice* noticed the Ruthie tap handle and wrote an online article about Exile and Ruthie's life, which Exile promoted. (Id., ¶¶ 39–42; ECF 104-3, ¶ 45; ECF 90-3, pp. 172–86.) Later, on December 5, 2019, Exile filed a trademark application with the U.S. PTO for the name "RUTHIE." (ECF 114-2, ¶ 72.) The trademark was registered on March 16, 2021. (ECF 113-2, ¶ 21.)

Exile's marketing coordinator testified that in 2019 Exile was discussing ways to share Ruthie's story and alleviate growing concerns that Ruthie's imagery, alone, might offend some customers. (ECF 124, ¶ 44–47; see also ECF 112-2, ¶ 30.) As a result of that discussion, Exile decided to conduct a survey in July 2020 to gain a better understanding of people's views regarding Ruthie. (ECF 104-3, ¶¶ 31–34; ECF 90-3, pp. 342–52.) The survey went to people who "had knowledge of its 'Ruthie' beer." (ECF 104-3, ¶ 32.) Among other things, the survey asked a multiple-choice question: "Who created the Ruthie story?" (Id., ¶ 33.) Nearly all responders correctly responded, "No one, Ruthie was a real person." (Id., ¶ 34.) The survey also asked what feelings Ruthie's imagery evoked, with options from "immoral," "sexist," and "misogynist," to "trailblazer," "empowerment," and "fun." (ECF 90-3, p. 342.) Responses varied. (Id., pp. 345–52.)

Exile has expanded its product line since 2016 and now offers the following "Ruthie" products: whiskey, non-alcoholic beer, and black and bold coffee beer. (ECF 104-3, ¶ 48.) Exile has also expanded into neighboring states. (Id., ¶ 50.) Additionally, Exile promotes "Ruthie" by

holding a "birthday party" for her every January where Exile sells beer for 50 cents for one hour. (Id., ¶ 47.) Customers often attend the party dressed as "Ruthie," although it is disputed whether Exile encourages this. (Id.)

5. 2020: Huntsman Reopens the Estates and Sues Exile.

Huntsman asserts that he and other heirs discussed Exile's use of "Ruthie" following his sister Andrea's funeral in 2019 and realized, for the first time, that no one had given Exile permission to use Ruthie's name and likeness. (ECF 114-2, ¶ 63; ECF 124, ¶¶ 53–55.) Huntsman said he believed Ruthie's legacy should be kept alive, and that he wants to help the family gain control of how her image is used. (ECF 112-2, ¶ 12.) He admits, however, that the Estates have not "completely formulated" those plans. (Id.) On March 9, 2020, he petitioned to have Frank's Estate reopened, alleging that he "hired an attorney to investigate and pursue potential claims against a corporation" that, if successful, would benefit Frank's Estate. *Est. of Bisignano*, 2023 WL 3479173, at *2. The probate court granted Huntsman's petition the following day and reopened Frank's Estate, appointing Huntsman as administrator. *Id*. Several months later, on September 18, 2020, Huntsman petitioned to have Ruthie's Estate reopened for the same reason. *Id*. The probate court granted that petition on September 22, 2020, reopening Ruthie's Estate and appointing Huntsman as administrator. *Id*. The Estates[9] sued Exile in Iowa state court on June 1, 2020. *Id*.

C. *Procedural History.*

In June 2020, the Estates filed their petition in Iowa state court, alleging six causes of action under state law: (1) common law appropriation of name and/or likeness; (2) common law appropriation of the right of publicity; (3) common law misappropriation of trade values; (4) consumer fraud pursuant to Iowa Code Chapter 714H; (5) common law deceptive marketing for misrepresentations regarding endorsement and/or approval; and (6) common law trade and service mark infringement. *Id*. Exile moved to dismiss, arguing the Estates lacked standing, the court lacked jurisdiction, and the Estates' claims were barred by the statute of limitations or otherwise legally or factually deficient. *Id.* The Iowa District Court for Polk County denied the motion in August 2020. *Id*. The Estates then moved for partial summary judgment in June 2021, seeking disposition in their favor on Counts I and II (right of publicity claims) as well as a permanent injunction to enjoin Exile from continued use of Ruthie's name and/or likeness. *Id*. at *3. Exile

---

[9] Frank's Estate was the initial plaintiff, with Ruthie's Estate added on October 19, 2020. *Est. of Bisignano*, 2023 WL 3479173, at *2–3.

resisted and, in August 2021, filed a cross-motion for summary judgment on Counts I and II while also claiming that standing, jurisdiction, laches, and judicial estoppel warranted dismissal of all the Estates' claims. *Id*.

While those motions were pending in the civil proceeding, Exile, as an interested party, filed a motion to vacate, dismiss, and close Frank and Ruthie's Estates in August 2021 in the probate court. *Id*. Exile argued the probate court did not have jurisdiction to reopen either Estate to re-distribute Ruthie's intellectual property. *Id*. Exile's arguments in probate court mirrored some of the arguments it made in the civil case, including as it related to whether the Estates were improperly reopened and had standing. *Id*.

The probate court ruled first. *Id*. In November 2021, it held that it held that "new property" in the form of "potential claims against Exile" had been found, giving the probate court jurisdiction to reopen the Estates under Iowa Code § 633.489. *Id*. The probate court did not decide, however, whether Ruthie's intellectual property could or did descend to Ruthie's heirs. *Id*. The probate court further held that Exile had no right to intervene in the proceedings and was instead an interloper. *Id*. Exile filed a motion to reconsider, which the probate court denied in January 2022. *Id*. Exile appealed the probate court's denial to the Iowa Supreme Court in February 2022. *Id*. at \*4; *see Matter of Est. of Bisignano*, 991 N.W.2d 135, 139 (Iowa 2023).

Shortly after the probate court ruling, the Iowa District Court for Polk County ruled on the parties' cross-motions for summary judgment in the civil case. *Est. of Bisignano*, 2023 WL 3479173, at \*3. It "took no action" on Exile's arguments regarding standing and jurisdiction, deferring instead to the probate court's conclusion that the Estates were properly reopened. *Id*. The court denied both sides' summary judgment motions, as well as the Estates' motion to reconsider. *Id*. In April 2022, the Estates were granted leave to amend their pleadings to add a claim under the (federal) Lanham Act, 15 U.S.C. § 1125(a). *Id*. With a federal question having been raised for the first time, Exile removed the case to this Court. (ECF 1.)

In January 2023, Exile moved to certify eight questions to the Iowa Supreme Court, including on the issues of whether the Iowa Supreme Court would recognize the viability of the Estates' common law causes of action and, if so, what elements, exceptions, and statutes of limitations applied. (ECF 46.) The Court denied the motion because Exile's questions were largely hypothetical and, where they were not, this Court was capable of answering them. *See Est. of Bisignano*, 2023 WL 3479173, at \*1.

In May 2023, the Iowa Supreme Court affirmed the probate court's decision to reopen the Estates and deny Exile's request to intervene. *See Matter of Est. of Bisignano*, 991 N.W.2d 135. The Iowa Supreme Court held that it was inappropriate for Exile to challenge the validity of the Estates' claims in the probate court. *Id*. at 140–41. It would "not turn the probate court's simple reopening of the estates into a second litigation over whether or to whom the potential debt [for appropriation] is owed where Exile has no other connection to the estates." *Id*. at 143. The Iowa Supreme Court "advance[d] no views and [took] no position on the existence or inheritability of Ruth's name, image, and likeness rights," which it held was a subject for the civil case now in this Court. *Id*. at 142–43.

There are seven motions now pending, including two by the Estates: a motion for partial summary judgment on the Lanham Act Claim (ECF 89) and a motion *in limine* to exclude some of Exile's experts reports (ECF 86). Exile filed the remaining five motions, one of which is to exclude portions of the Estates' expert reports. (ECF 92.) The others are for summary judgment or judgment on the pleadings based on: the merits as to the Lanham Act claim (ECF 81); preemption as to the common law claims (ECF 74); the merits of the common law claims (ECF 77); and the merits of the affirmative defenses of statute of limitations, laches, abandonment, and acquiescence (ECF 83). Exile also moved for judgment on the pleadings on the consumer fraud act claim (ECF 76), but the Estates responded by withdrawing those claims, so the Court denied Exile's motion as moot (ECF 103).

## III.   LEGAL STANDARDS.

### A.  Summary Judgment Standards.

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Smith*, 250 F.3d at 1171. "A fact is material if it 'might affect the outcome of the suit.'" *Dick v. Dickinson State Univ*., 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp*., 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248).

"When cross-motions for summary judgment are presented to the Court, the standard summary judgment principles apply with equal force." *Wright v. Keokuk Cnty. Health Ctr*., 399 F.

Supp. 2d 938, 945–46 (S.D. Iowa 2005). "[T]he court views the record in the light most favorable to plaintiff when considering defendant's motion, and the court views the record in the light most favorable to defendant when considering plaintiff's motion." *Thompson-Harbach v. USAA Fed. Sav. Bank*, 359 F. Supp. 3d 606, 614 (N.D. Iowa 2019).

   B.  *Judgment on the Pleadings Standards.*

   "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "As a general rule, a Rule 12(c) motion for judgment on the pleadings is reviewed under the same standard as a 12(b)(6) motion to dismiss." *In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d 1047, 1056 (8th Cir. 2018). Therefore, the Court "accept[s] as true all facts pled by the non-moving party and grant[s] all reasonable inferences from the pleadings in favor of the non-moving party." *Nat'l Union Fire Ins. Co. of Pittsburgh v. Cargill, Inc.*, 61 F.4th 615, 619 (8th Cir. 2023). "Judgment on the pleadings is appropriate when there is no material issue of fact and the moving party is entitled to judgment as a matter of law." *Country Preferred Ins. Co. v. Lee*, 918 F.3d 587, 588 (8th Cir. 2019).

   Exile brought two of its motions as "Rule 12(c) Motion[s] for Partial Judgment on the Pleadings or (Alternative) Rule 56 Motion[s] for Partial Summary Judgment." (ECF 74; ECF 81.) Where the Court considers matters outside the pleadings, a motion for judgment on the pleadings "shall be treated as one for summary judgment." *Surgical Synergies, Inc. v. Genesee Assocs., Inc.*, 432 F.3d 870, 873 (8th Cir. 2005) (quoting Fed. R. Civ. P. 12(c)). The Court will decide the parties' respective motions with the benefit of the full record, which is several thousand pages long. Exile's motions for judgment on the pleadings are therefore converted to motions for summary judgment.

## IV.   LEGAL ANALYSIS: PREEMPTION.

   A.  *Exile Waived the Right to Raise Preemption.*

   The Court will begin by addressing Exile's argument that the Estates' state common law claims (Counts I, II, III and V) are preempted by the Copyright Act and Lanham Act. (ECF 74.) Preemption is an affirmative defense that is generally waived unless pled in the answer. *See Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 714–15 (8th Cir. 2008). Here, Exile pled twenty-four affirmative defenses but did not mention preemption. (ECF 12, ¶¶ 100–125.) Instead, at most, it raised the so-called "affirmative defenses" of: (i) failure to state a claim; (ii) failure to comply with statutory requirements; and (iii) failure to state a cause of action recognized under Iowa common law. (ECF 127, pp. 7–8.) Exile argues that these defenses are "close enough" to

preemption to preserve the issue, particularly under the lenient notice pleading standard Exile urges the Court to apply.

In *National Union Fire Insurance Company of Pittsburgh v. Cargill, Inc.*, the Eighth Circuit held that a "generic reservation of the right to assert affirmative defenses" was insufficient to raise affirmative defenses that might preclude judgment as a matter of law. 61 F.4th at 620. This Court interprets *Cargill* as having "answered a question that this Court (and many other district courts in the Eighth Circuit) have been pondering for years: whether the heightened pleading standard recognized in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) applies to affirmative defenses." *Auto-Owners Mut. Ins. Co. v. Coffin*, No. 4:22-CV-00129-SHL-HCA, 2023 WL 3479170, at *6 (S.D. Iowa May 1, 2023). "*Cargill* appears to have concluded that the answer is 'yes,' at least when a motion for judgment on the pleadings has been filed." *Id.* Exile's generic affirmative defenses of "failure to state a claim," "failure to comply with statutory requirements," and "failure to state a cause of action recognized under Iowa common law" amount to the type of "[t]hreadbare recitals" that do not pass muster under this standard. *Cargill*, 61 F.4th at 620 (citing *Mick v. Raines*, 883 F.3d 1075, 1079 (8th Cir. 2018)).

The Court would reach the same conclusion even if *Cargill* should not be interpreted as applying a heightened pleading standard to affirmative defenses. Under the more lenient "notice pleading" standard that courts sometimes apply, *see, e.g.*, *Hull Partners, LLC v. Clean Fuels All. Am.*, 642 F. Supp. 3d 809, 829–30 (S.D. Iowa 2022), Exile still must have pled enough to put the Estates on notice that preemption was at issue. The affirmative defenses identified by Exile do not satisfy this requirement. The Second Circuit has held that alleging that the plaintiff's complaint fails to state a claim does not provide adequate notice that preemption is at issue. *See Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003); *see also Hull Partners*, 642 F. Supp. 3d at 830 (failure to state a claim is "not an affirmative defense at all"). This Court agrees.

The affirmative defenses of "failure to comply with statutory requirements" and "failure to state a cause of action recognized under Iowa common law" are even further off the mark. Neither of them uses the word "preemption," nor would they place even the most astute reader on reasonable notice that preemption might be at issue. *See, e.g.*, *Liguria Foors, Inc. v. Griffith Lab'ys, Inc.*, No. C14-3041-MWB, 2014 WL 6066050, at *5 (N.D. Iowa Nov. 13, 2014) (striking preemption defense based on failure to provide factual basis or identify federal statute with preemptive effect); *Lemery v. Duroso*, No. 4:09CV00167 JCH, 2009 WL 1684692, at *3 (E.D.

Mo. June 16, 2009) (similar). In fact, when applying preemption, courts generally presume the plaintiff *has* stated a cause of action recognized under the common law and complied with statutory requirements; otherwise, there would be nothing to "preempt." The Court therefore concludes that Exile did not sufficiently plead preemption even under the most liberal notice pleading standard.

Having reached this conclusion, the Court must decide whether Exile is allowed to raise preemption for the first time in a motion for summary judgment. The Eighth Circuit addressed this very issue in *Sherman v. Winco Fireworks, Inc.*, holding that when preemption is raised for the first time in a summary judgment motion after the deadline for amending pleadings has passed, the defense is waived unless there is "good cause" to amend the scheduling order pursuant to Fed. R. Civ. P. 16(b). 532 F.3d at 715–16. The application of the good cause standard is "not optional," and the primary inquiry is whether the moving party acted with diligence. *Id.* at 716–17. In *Sherman*, the defendant did not establish good cause because it failed to raise preemption until two-and-one-half years after the case was filed, one month after the close of discovery, and eighteen months after the deadline for amending pleadings. *Id*. at 717–18.

The delay here is similar. Exile filed its motion for summary judgment approximately three years after the case was filed, one month after the close of discovery, and nine months after the deadline for amending pleadings. (ECF 37; ECF 54.) Moreover, like the defendant in *Sherman*, Exile was aware of preemption as a potential affirmative defense because the Estates argued that it did not apply when they moved for partial summary judgment in state court. (ECF 2, p. 468–69.) Exile's response was silent on preemption, focusing instead on waiver, laches, and estoppel. (ECF 4, pp. 412–56.) It is far too late now for Exile to raise preemption. *See Smith-Haynie v. D.C.*, 155 F.3d 575, 578 (D.C. Cir. 1998) ("[A]n affirmative defense not raised by answer cannot be raised in dispositive motions that are filed post-answer."); *see also Stark v. Hamelton*, No. 318CV00069RGESHL, 2021 WL 4056716, at \*3 (S.D. Iowa Sept. 2, 2021) (holding that "good cause" did not exist to add affirmative defense well after deadline). Instead, *Sherman* compels the Court to conclude that Exile waived preemption as an affirmative defense. 532 F.3d at 717–18.

This conclusion is unchanged by Exile's argument that it placed preemption at issue in January 2023 when it mentioned the possibility of a conflict between federal and state law as part of its motion to certify questions to the Iowa Supreme Court. (ECF 127, p. 8.) The motion to certify was filed several months before the discovery deadline, and thus the timing is better for Exile. But still too late. Exile filed the motion to certify two-and-one-half years after the Estates filed the case

and four months after the deadline for amending pleadings. (ECF 37.) Under *Sherman*, the Court therefore still would have to apply the "good cause" standard, which Exile cannot satisfy. The preemption defense therefore has been waived even if the motion to certify is treated as "notice."

The Court does not, in any event, interpret the motion to certify as providing notice that Exile intended to raise preemption as an affirmative defense. At the risk of stating the obvious, the purpose of Exile's motion in January 2023 was to certify questions to the Iowa Supreme Court, not to amend the pleadings or extend case deadlines. This is far different than how Exile is now asking the Court to interpret the motion. In essence, Exile wants the Court to retroactively treat the motion to certify as a request to extend the deadline for amending pleadings *and* to treat the request as having been granted *and* to treat the motion as the amendment itself *and* to interpret the motion as having done enough to place preemption at issue. This argument is unpersuasive at every level.

For these reasons, the issue of preemption is waived, and the Court DENIES Exile's Motion for Summary Judgment (ECF 74) on that issue.

## V.      LEGAL ANALYSIS: STATE COMMON LAW CAUSES OF ACTION.

### A.   *The Iowa Supreme Court Would Recognize the Viability of the Estates' Common Law Causes of Action.*

The Estates' Second Amended Complaint includes four common law causes of action under Iowa law: (1) appropriation of name and/or likeness (Count I); (2) appropriation of the right of publicity (Count II); (3) misappropriation of trade values (Count III); and (4) deceptive marketing based on misrepresentations regarding endorsement and/or approval (Count V). (ECF 1-5.) The Estates seek the same relief for each of the four claims, which the Court will sometimes refer to collectively as involving the "right of publicity." Exile argues that all four claims fail because the Iowa Supreme Court would not recognize them as viable theories of recovery.

The Court has little difficulty predicting that the Iowa Supreme Court would recognize a cause of action for appropriation of name and likeness, as alleged in the Estates' Count I. As far back as 1962, the Iowa Supreme Court identified "[a]ppropriation, for defendant's advantage, of the plaintiff's name or likeness" as one of four torts recognized by Dean Prosser under the umbrella term "right to privacy." *Yoder v. Smith*, 112 N.W.2d 862, 863–64 (Iowa 1962). The viability of name and likeness claims was not at issue in *Yoder v. Smith*, but the Iowa Supreme Court clearly viewed Dean Prosser favorably. *See id*. Sixteen years later, in *Winegard v. Larsen*, the Iowa Supreme Court reiterated its favorable view of Prosser and the four "invasion of privacy" torts, stating: "We recognize a common law tort for invasion of privacy in Iowa. We have also cited

with approval Professor Prosser's characterization of the kinds of actionable invasion which may occur." 260 N.W.2d 816, 818 (Iowa 1977) (internal citation omitted). In decisions both before and after *Yoder* and *Winegard*, the Iowa Supreme Court recognized the viability of causes of action for invasion of privacy torts other than appropriation of name and likeness. *See, e.g.*, *Bremmer v. J.-Trib. Pub. Co.*, 76 N.W.2d 762, 764 (1956); *Stessman v. Am. Black Hawk Broad. Co.*, 416 N.W.2d 685, 687 (Iowa 1987).

In 1977, the Restatement (Second) of Torts adopted Dean Prosser's views on the four "invasion of privacy" torts. *See* Restatement (Second) of Torts §§ 652A–652I (1977). In turn, the Iowa Supreme Court began favorably citing the Restatement instead of (or in addition to) Prosser as it related to those torts. *See Howard v. Des Moines Reg. & Trib. Co.*, 283 N.W.2d 289, 291 (Iowa 1979) ("We have adopted the principles of the tort [of invasion of privacy] delineated in Restatement (Second) of Torts § 652 (1977)."). In *Anderson v. Low Rent Housing Commission of Muscatine*, for example, the Iowa Supreme Court favorably recognized—as it had nineteen years earlier in *Yoder*—that "appropriation of the other's name or likeness" is an invasion of privacy tort. 304 N.W.2d 239, 248 (Iowa 1981) (citing favorably to Restatement (Second) of Torts, § 652A). The Iowa Supreme Court continues to do so in more recent cases. *See Koeppel v. Speirs*, 808 N.W.2d 177, 181 (Iowa 2011); *In re Marriage of Tigges*, 758 N.W.2d 824, 829 (Iowa 2008).

The Iowa Supreme Court apparently has never decided a case involving the specific tort of appropriation of name and likeness. Instead, the cases have all involved other invasion of privacy torts. *See, e.g.*, *Koeppel*, 808 N.W.2d at 181. Nonetheless, given the consistency and volume of the favorable citations to the Restatement (Second) of Torts and Dean Prosser, it is unfathomable that the Iowa Supreme Court would not recognize appropriation of name and likeness as a viable theory if squarely presented with the question. This Court therefore concludes the Estates have stated a viable claim in Count I for appropriation of Ruthie's name and likeness. *See Holbein v. TAW Enters., Inc.*, 983 F.3d 1049, 1061 (8th Cir. 2020) ("In making our prediction [as to how a state's highest court would rule on an issue of state law], we may consider relevant state precedent, analogous decisions, considered dicta, scholarly works and any other reliable data . . . We may pay particular attention to sources cited approvingly by the state's highest court." (cleaned up)); *Gilstrap v. Amtrak*, 998 F.2d 559, 560 (8th Cir. 1993) ("Reliable data that a federal court may consider include scholarly treatises, the Restatement of Law, and germane law review articles." (quotation omitted)).

The Court reaches the same conclusion on the Estates' Count II, which alleges appropriation of the right of publicity. This tort is recognized in the Restatement (Third) of Unfair Competition (1995), which the Iowa Supreme Court also often favorably cites. *See, e.g.*, *Cmty. State Bank, Nat. Ass'n v. Cmty. State Bank*, 758 N.W.2d 520, 525–27 (Iowa 2008); *Cemen Tech, Inc. v. Three D Indus., L.L.C.*, 753 N.W.2d 1, 7 (Iowa 2008); *Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 761 (Iowa 1999). Section 46 of the Restatement (Third) of Unfair Competition explains that the "principal historical antecedent of the right of publicity is the right to privacy," which it traces to back to Dean Prosser. *See* Restatement (Third) of Unfair Competition, § 46 cmt. b (1995). Meaning: the right of publicity is recognized by a Restatement that the Iowa Supreme Court views favorably and derives from the scholarship of a commentator whom the Iowa Supreme also views favorably. This is more than enough for the Court to predict with confidence that the Iowa Supreme Court would recognize the right of publicity if presented with the question. *See Holbein*, 983 F.3d at 1061. Indeed, then-Chief Judge Melloy reached this very conclusion more than twenty years ago. *See Sharp-Richardson v. Boyds Collection, Ltd.*, No. C 96-0344 MJM, 1999 WL 33656875, at *15 (N.D. Iowa Sept. 30, 1999); *see also Ventura v. Titan Sports, Inc.*, 65 F.3d 725, 730 (8th Cir. 1995) (predicting Minnesota would adopt the right of publicity based on its history of prohibiting misappropriation of trade names).

This conclusion is consistent with the strong trend in other states. Thirty-three states now recognize a right of publicity through statutes or the common law. *See* 1 J. Thomas McCarthy & Roger E. Schechter, *Rights of Publicity and Privacy* § 6:2 (2d ed. 2023) (hereinafter "McCarthy, *Rights of Publicity and Privacy*"). Like the Restatement (Third) of Unfair Competition, these cases recognize that the right of publicity is a species of the right to privacy, which the Iowa Supreme Court has protected for nearly seventy years. *See Bremmer*, 76 N.W.2d at 764; *see also* McCarthy, *Rights of Publicity and Privacy* § 1:17 (the right "developed within the domain of 'privacy' law" but is now properly regarded as a commercial tort redressing unfair competition). The Iowa Supreme Court surely would do the same for the right of publicity.

For essentially the same reasons, the Court concludes the Iowa Supreme Court would recognize causes of action for appropriation of trade values (Count III) and deceptive marketing involving false endorsement (Count V). Like the right of publicity, these causes of action are recognized in the Restatement (Third) of Unfair Competition, which prohibits appropriation of trade values that harms another's commercial relations. *See* Restatement (Third) of Unfair

Competition, § 38. As the Court has already concluded the Iowa Supreme Court would recognize a right of publicity, it similarly predicts the Iowa Supreme Court would rely on the Restatement (Third) of Unfair Competition to recognize the torts of appropriation of trade values and deceptive marketing involving false endorsement. *See, e.g.*, *Winegard*, 260 N.W.2d at 822. The Court therefore DENIES Exile's motions for summary judgment to the extent they argue that the Iowa Supreme Court would not recognize the Estates' common law causes of action.

## VI.     LEGAL ANALYSIS: THE ESTATES' STANDING TO BRING COMMON LAW CAUSES OF ACTION.

Having concluded that the Estates' common law causes of action would be recognized by the Iowa Supreme Court, the Court next must decide whether those causes of action are viable *here*. Exile offers several reasons why not, starting with the argument that the Estates lack standing. In Exile's view, Ruthie's right of publicity and related rights did not descend to her heirs following her death and have been abandoned anyway.

### A.   *The Iowa Supreme Court Would Treat the Estates' Causes of Action as Involving Property Rights, Not Personal Rights.*

Before addressing the issue of descendibility head-on, the Court must answer a preliminary question: would the Iowa Supreme Court treat the common law claims asserted by the Estates as involving <u>property</u> rights or <u>personal</u> rights? Prior to the case being removed to federal court, Judge David Nelmark of the Iowa District Court for Polk County addressed this question as part of his ruling on Exile's pre-answer motion to dismiss and concluded the claims involve property rights:

> Certain claims "personal to the decedent" cannot survive her passing. *Maghee v. State*, 773 N.W.2d 228, 232 (Iowa 2009). However, none of the claims asserted in this matter are "personal to the decedent." Each claim stems from the alleged misappropriation of Ruthie's name, image, and likeness. Although most "invasion of privacy" are personal, misappropriation claims are not. Restatement (Second) of Torts § 652I & cmt. a (Am. L. Inst. 1977), Westlaw (updated June 2020) ("The right protected by the action for invasion of privacy is a personal right, peculiar to the individual whose privacy is invaded. The cause of action is not assignable, and it cannot be maintained by other persons such as members of the individual's family, unless their own privacy is invaded along with his. **The only exception to this rule involves the appropriation to the defendant's own use of another's name or likeness.**") (emphasis added). Because the claims of misappropriation are not personal to Ruthie, they passed to Frank Bisignano along with all of Ruthie's other property. Restatement (Third) of Unfair Competition § 46 cmts. b, g (Am. L. Inst. 1995), Westlaw (updated June 2020) ("[t]he interest in the commercial value of a person's identity [i.e., the right of publicity] is in the nature of a property right and is freely assignable to others").

20

(ECF 2, pp. 80–81.)

Judge Nelmark's ruling was interlocutory and thus is not law of the case or otherwise binding on this Court. Nonetheless, after reviewing the issue independently, this Court agrees in full with his cogent analysis. As noted above, the Iowa Supreme Court routinely follows the Restatement (Second) of Torts when defining and evaluating tort claims. *See, e.g.*, *Beverage v. Alcoa, Inc.*, 975 N.W.2d 670, 686 (Iowa 2022) (citing favorably to tort cases relying on Restatement (Second) of Torts to determine the scope of tort liability); *Hoffman v. Clark*, 975 N.W.2d 656, 665 (Iowa 2022) (relying on Restatement (Second) of Torts in evaluating validity of damages award in libel case). Under the Restatement (Second) of Torts, appropriation of a person's name or likeness "is in the nature of a property right" and will give rise to a cause of action if there is improper use "to advertise the defendant's business or product, or for some similar commercial purpose." Restatement (Second) of Torts § 652C cmt. a, b (1977). As Judge Nelmark correctly recognized, this makes appropriation of name and likeness different from other invasion of privacy torts, which involve personal rights in non-commercial settings. As the Restatement (Second) of Torts explains, "the invasion of the right to privacy has been a complex of four distinct wrongs, whose only relation to one another is that each involves interference with the interest of the individual in leading, to some reasonable extent, a secluded and private life, free from the prying eyes, ears and publications of others." *Id.* § 652A cmt. b; *see also Canessa v. J. I. Kislak, Inc.*, 235 A.2d 62, 76 (N.J. Law. Div. 1967).

The Restatement (Third) of Unfair Competition likewise treats the right of publicity as a property right when a plaintiff seeks relief based on a defendant's commercial exploitation of name and likeness. *See* Restatement (Third) of Unfair Competition § 46 cmt. g (1995). As with the Restatement (Second) of Torts, the Iowa Supreme Court often relies upon the Restatement (Third) of Unfair Competition. *See, e.g., Cemen Tech,* 753 N.W.2d at 7; *Revere Transducers*, 595 N.W.2d at 761. Given (a) the Iowa Supreme Court's proclivity for following the Restatements, and (b) the recognition in the Restatements that right-of-publicity-type claims are correctly understood as involving property rights, the Court concludes the Iowa Supreme Court would treat the Estates' causes of action as involving property rights, not personal rights. This Court will do the same.

Although the issue is governed by Iowa law, the Court notes that the Eighth Circuit reached a similar conclusion under Minnesota law in *Ventura v. Titan Sports, Inc.*, 65 F.3d at 730. As of the year *Ventura* was decided, the Minnesota Supreme Court had not recognized a right to privacy.

Nonetheless, the Eighth Circuit affirmed the district court's conclusion that the Minnesota Supreme Court would recognize and enforce a right of publicity. *Id. Ventura* explained that the right of publicity is not like right to privacy claims involving intrusion upon seclusion or similar theories. *Id.* "The policy underlying the tort of invasion of privacy is the protection of the privacy and solicitude of private personae from the mental distress that accompanies undesired publicity." *Id.* By contrast, "[t]he right to publicity protects the ability of public personae to control the types of publicity that they receive. The right to publicity protects pecuniary, not emotional, interests. As such, the policy underlying the right to publicity is more akin to the policy underlying the protection of trade names. . . ." *Id.* The Eighth Circuit's analysis in *Ventura* is fully in line with the Restatements and leaves this Court particularly confident that the Iowa Supreme Court would treat the right of publicity as a property right, not a personal right.

     B. *Ruthie's Common Law Rights Descended to Her Heirs Upon Her Death.*

The understanding of the Estates' claims as involving property rights provides important guidance for the questions the Court must answer as to the Estates' standing, including: (1) would the Iowa Supreme Court conclude that intangible property rights like the right of publicity descended to Ruthie's heirs following her death; and (2) if so, do those rights (and any causes of action arising therefrom) remain viable even though Ruthie was not exploiting her name and likeness at the time of her death? The Court concludes that the answer to both questions is "yes."

     1. <u>The Iowa Supreme Court Would Conclude that Intangible Rights Like Those at Issue Here Descended to Ruthie's Heirs Following Her Death.</u>

On the first question, the Court has little difficulty predicting that the Iowa Supreme Court would hold that intangible rights like the right of publicity and name and likeness descend to a person's heirs. The analysis starts with the Iowa Probate Code, which defines "property" as "both real and personal property." Iowa Code § 633.3(35). Before the Probate Code was enacted in 1963, the Iowa Supreme Court interpreted the word "property" broadly to include "everything of value, tangible or intangible, capable of being the subject of individual right or ownership." *Clark v. Lucas Cnty. Bd. of Rev.*, 44 N.W.2d 748, 758 (Iowa 1950) (quoting *First Nat. Bank v. City Council of Estherville*, 112 N.W. 829, 832 (Iowa 1907)). The Court must assume the Iowa Legislature intended to adopt this broad definition "without qualification" when it enacted the Probate Code. *See Johnson v. Nelson*, 275 N.W.2d 427, 430 (Iowa 1979) (concluding the Legislature intended to incorporate the broad definition of property "without qualification" when it enacted the Iowa Rules of Civil Procedure); *see also Harvey v. Care Initiatives, Inc.*, 634 N.W.2d 681, 685 (Iowa 2001)

("[W]e construe statutory language consistent with our case law and the common law."). More specifically, the Court must assume the Iowa Legislature intended to "include both tangible and intangible property" in the definition of "property" in section 633.3(35). *See id.*; *see also* Iowa Code § 4.1(21) (defining "personal property" to include "money, goods, chattels, evidences of debt, and things in action"). It follows that Ruthie's right of publicity and similar rights were assets that could descend to her heirs upon death.

This conclusion is consistent with the strong weight of authority from other jurisdictions. According to one commentator, there are at least twenty-seven states that recognize a postmortem right of publicity, nineteen by statute and eight by common law. *See* McCarthy, *Rights of Publicity and Privacy* § 9:17. It appears that most of the remaining twenty-three states are, like Iowa, "agnostic as to the issue of a post-mortem right of publicity" in the sense that courts in those states have not definitively ruled one way or the other. *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 326 (6th Cir. 2001). Accordingly, among courts to have addressed the issue, the "clear trend and majority rule recognizes that the right of publicity does last after death and has a postmortem duration of some period." McCarthy, *Rights of Publicity and Privacy* § 9:17; *accord Paisley Park Enters., Inc. v. Boxill*, 299 F. Supp. 3d 1074, 1082 (D. Minn. 2017) ("The clear weight of authority from jurisdictions that have addressed this issue supports a conclusion that the right of publicity is a property right that is enforceable by a decedent's estate.").

Courts that have reached this conclusion under the common law have either expressly or implicitly followed the logic of the Restatement (Second) of Torts and/or Restatement (Third) of Unfair Competition, both of which recognize that the right of publicity is different from other invasion of privacy torts. *See, e.g.*, *In re Estate of Reynolds*, 327 P.3d 213, 217 (Ariz. Ct. App. 2014); *Herman Miller, Inc.*, 270 F.3d at 325–26 (Michigan law); *State ex rel. Elvis Presley Int'l Mem'l Found. v. Crowell*, 733 S.W.2d 89, 95 (Tenn. Ct. App. 1987); *Nature's Way Prod., Inc. v. Nature-Pharma, Inc.*, 736 F. Supp. 245, 252 (D. Utah 1990). These courts therefore have concluded that the right of publicity descends in probate to the same extent as other property rights. *See, e.g.*, *In re Estate of Reynolds*, 327 P.3d at 217. Given the Iowa Supreme Court's penchant for following the Restatements, the Court is confident it would reach the same conclusion.

23

2. <u>The Iowa Supreme Court Would Conclude that Publicity Rights Descend Even if They Are Not Actively Being Exploited at the Time of Death.</u>

The next question is whether the right of publicity and similar intangible rights descend to a person's heirs even when those rights are not actively being exploited at the time of death. This question has both procedural and substantive components.

As a matter of procedure, Exile argues that Ruthie's rights to publicity and name and likeness did not descend to her heirs because Frank did not list them as assets on the Final Report in her Estate, nor did the administrator of Frank's Estate include them in Frank's assets following *his* death. The Court disagrees with Exile's position that this *per se* means the rights were not inherited. The Iowa Probate Code recognizes that property is not automatically forfeited or abandoned simply because it is left out of an estate's inventory. *See* Iowa Code § 633.489. Instead, in such circumstances, the estate may be reopened to allow disposition of the newly-identified property. *See Ritz v. Selman United Methodist Church*, 467 N.W.2d 266, 270 (Iowa 1991). "Section 633.489 does not place any time limitation on reopening for such purposes." *Id.* As Huntsman reopened the Estates here, the Estates are not precluded from pursuing claims based on Ruthie's name and likeness simply because the intangible rights underlying those claims were not listed on the Final Report during the original administration of her or Frank's Estates.

As a matter of substance, Exile argues that Ruthie's right of publicity and name and likeness did not descend because she was not using or exploiting them at the time of her death. Again, the Court disagrees—at least to the extent Exile is arguing that non-use *per se* means the rights cannot be inherited. Exile cites no persuasive authority to suggest that either the Iowa Legislature or Iowa Supreme Court has ever required active use of intangible property rights at the time of death as a necessary condition for those rights to descend. To the contrary, careful review of the plain text of the Probate Code shows that such rights descend regardless of active use.

The analysis starts with Iowa Code § 633.3(35), which, as noted above, defines "property" broadly and simply to include "both real and personal property." Elsewhere, the Iowa Code defines "personal property" to include "things in action." Iowa Code § 4.1(21). Under Iowa law, "[a] 'chose in action' is the same thing as a 'thing in action.'" *Arbie Min. Feed Co. v. Farm Bureau Mut. Ins. Co.*, 462 N.W.2d 677, 680 (Iowa 1990). Intellectual property rights are "choses in action." *In re Simply Essentials, LLC*, No. BR 20-00305, 2023 WL 2903645, at *2 (Bankr. N.D. Iowa Apr. 11, 2023) (recognizing that the Iowa Legislature has adopted the Uniform Commercial Code, which defines "general intangible" to include intellectual property); *see also Keller v. Bass*

*Pro Shops, Inc.*, 15 F.3d 122, 125 (8th Cir. 1994) ("Patents are choses in action."). Thus, the definition of "property" in Iowa Code § 633.3(35) is broad enough to include intangible rights like those pertaining to intellectual property.

A holder of intellectual property rights does not immediately lose those rights through non-use. Instead, depending on the nature of the right, it may endure as long as seventy years or more after the person's death. *See, e.g.*, 17 U.S.C. § 302(a) ("Copyright in a work created on or after January 1, 1978 . . . endures for a term consisting of the life of the author and 70 years after the author's death.") When the Iowa Legislature defined "property" broadly enough in section 633.3(35) to include intellectual property rights, this necessarily included *unused* intellectual property rights that had not yet expired. It follows that those unused rights are part of the "property" that passes to the decedent's heirs or devisees. *See* Iowa Code § 633.350 ("Except as otherwise provided in this probate code, when a person dies, the title to the person's property, real and personal, passes to the person to whom it is devised by the person's last will, or, in the absence of such disposition, to the persons who succeed to the estate. . . ."). As there is nothing in the Iowa Probate Code that purports to create a special exception to descendibility for unused publicity-type rights, the Court must conclude that those rights—like all others—are descendible. The Court therefore concludes that Ruthie's publicity rights descended to her heirs even if she was not exploiting them at the time of her death.

This conclusion is consistent with the strong trend in other jurisdictions. In *Hebrew Univ. of Jerusalem v. General Motors LLC*, Judge Matz of the United States District Court for the Central District of California concluded that "[t]he overwhelming majority rule under either statute or common law is that the right of publicity is descendible property and has a postmortem duration which is *not conditioned on lifetime exploitation*." 878 F. Supp. 2d 1021, 1030 (C.D. Cal. 2012) (quoting McCarthy, *Rights of Publicity and Privacy* § 9:17), *vacated*, No. CV-10-3790-AB(JCX), 2015 WL 9653154 (C.D. Cal. Jan. 12, 2015)[10]. Judge Matz identified only three states that, as of 2012, appeared to require exploitation during the person's life as a condition of the postmortem right of publicity. *Id.* at 1028–29. Judge Matz carefully explained why he believed courts applying the law of those three states had it wrong. *Id.* at 1028–31. This Court agrees with his thoughtful

---

[10] *Hebrew Univ.* was vacated by joint motion of the parties following settlement. *See* 2015 WL 9653154, at *1. The Order Vacating Judgment and Dismissing the Action does not cast doubt on the validity of Judge Matz's analysis regarding the lifetime exploitation requirement. *See id.*

analysis. So, too, it appears, do judges and legislatures in other states. According to McCarthy, "it seems that only **one** state in the nation now has the lifetime exploitation requirement as a part of its law. The Restatement of Unfair Competition agrees that lifetime exploitation should not be a condition of a postmortem right of publicity." McCarthy, *Rights of Publicity and Privacy* § 9:15 (emphasis added). Exile offers no persuasive reason to believe the Iowa Supreme Court would depart from this "overwhelming" trend and treat the right of publicity and similar rights as being actionable postmortem only if they were exploited during the decedent's lifetime. In fact, the Iowa Supreme Court has relied on McCarthy's treatise in analyzing invasion of privacy torts in the past. *See Koeppel*, 808 N.W.2d at 180. The Court is confident it would do so again here.

There are two caveats to this conclusion. <u>First</u>, to the extent an intangible right expired or was forfeited or otherwise lost during the person's lifetime, the right would not descend because it would have ceased to exist. *See* Iowa Code § 633.489 ("[A] claim which is already barred can, in no event, be asserted in the reopened administration [of an estate]."). Thus, for example, if Ruthie owned a patent in the 1950s that expired prior to her death, it would not descend. Similarly, if Ruthie had consented to Exile's use of her name and likeness, her Estate likely would not have a viable claim. *See, e.g.*, *Gignilliat v. Gignilliat, Savitz & Bettis, L.L.P.*, 684 S.E.2d 756, 762 (S.C. 2009) (affirming grant of summary judgment for law firm on right of publicity claim because now-deceased partner consented to the use of his name before his death). This is of no assistance to Exile, however, because there is no evidence that Ruthie consented to the use of her name and likeness, nor could she have forfeited or abandoned her name and likeness and publicity rights while she was still alive. *See Abdul-Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 411 (9th Cir. 1996) ("A proper name thus cannot be deemed 'abandoned' throughout its possessor's life, despite his failure to use it, or continue to use it, commercially."). Instead, Ruthie held those rights until the moment she died. *See id.*

<u>Second</u>, although Ruthie's alleged non-use of her publicity rights is not *per se* a reason to conclude those rights did not descend, this does not mean evidence of her non-use is irrelevant to the Estates' causes of action. The Iowa Supreme Court has recognized that common law principles like abandonment, waiver, and estoppel have a role to play when there is a long delay between a person's death and a beneficiary's attempt to use estate property. *See In re Estate of Warrington*, 686 N.W.2d 198, 202–04 (Iowa 2004) (rejecting waiver and estoppel arguments after evaluating the beneficiary's "conduct and the surrounding circumstances"). In circumstances like those

present here, Ruthie's non-use of her publicity rights, if proven, might support Exile's position that the Estates and beneficiaries intended to abandon or otherwise forfeit those rights. This will be discussed in the next section.

Before reaching the issue of abandonment, however, one other issue should be addressed. Exile argues, correctly, that many state legislatures have passed laws addressing the extent to which publicity-type rights survive postmortem. (ECF 77-1, p. 19.) Some of those laws impose restrictions on who may assert such rights, *see, e.g.*, 42 Pa. Cons. Stat. § 8316(b)(3), Ark. Code § 4-75-1105(a), Cal. Civ. Code § 3344.1(e), while others limit the timeframe in which the rights may be asserted, *see, e.g.*, Tenn. Code § 47-25-1104(b)(2), Ala. Code § 6-5-773(g). Exile argues that this Court will invade the province of the Iowa Legislature if it allows Ruthie's rights to descend postmortem, especially if no temporal restrictions are imposed on the enforcement of those rights.

The premise of Exile's argument is strong: subject to constitutional limits, the Iowa Legislature has the ultimate authority to determine the scope of substantive rights under Iowa law. Beyond this premise, however, Exile's argument runs into problems. There is no reason to believe the Iowa Legislature wants to stop the development of the common law with respect to intellectual property or publicity rights. To the contrary, the Iowa Supreme Court has recognized common law intellectual property and publicity rights for decades without noticeable objection from the Legislature. *See, e.g.*, *Winegard*, 260 N.W.2d at 818 ("We recognize a common law tort for invasion of privacy in Iowa."). At most, the Legislature simply provides clarity in certain areas by enacting legislation that complements—but presumably does not supplant—the common law. *See 205 Corp. v. Brandow*, 517 N.W.2d 548, 551–52 (Iowa 1994) ("We have moreover said that 'statutes will not be so interpreted as to deprive one common-law right unless the statute unequivocally so states.'" (quoting *Price v. King*, 146 N.W.2d 328, 330 (Iowa 1966))).

Against this backdrop, the Court would be at greater risk of invading the province of the Legislature if did *not* allow Ruthie's publicity rights to descend. As noted above, the Iowa Legislature defined "personal property" broadly and without exception when it enacted the Probate Code. *See* Iowa Code § 633.3(35). It would be inappropriate for this Court to conclude that the Legislature nonetheless intended for certain forms of intangible property *not* to descend in probate, as the Court would be imposing its own policy judgment instead of accepting the Legislature's broad definition of "property" on its face. The Court therefore concludes that Ruthie's publicity, name and likeness, and similar rights descended to her heirs upon her death.

C. *The Iowa Supreme Court Would Not Conclude as a Matter of Law that Ruthie's Publicity Rights Have Been Abandoned, Waived, or Otherwise Forfeited; Instead, it Would Leave Those Issues for the Jury to Decide.*

1. <u>The Mere Passage of Time Is Not Enough to Establish Abandonment, Waiver, or Forfeiture of Ruthie's Publicity Rights.</u>

This brings the Court to a closely related question: did Ruthie's heirs waive or abandon her publicity and name and likeness rights, or otherwise acquiesce in Exile's use of those rights, as a matter of law? On the surface, Exile offers compelling arguments. Ruthie had not exploited her publicity rights for many years before her death in 1993, nor did her beneficiaries or anyone else connected to her Estate do so prior to Exile beginning to use Ruthie's name and likeness in 2012. Even then, another eight years went by before the Estates were reopened and this lawsuit was filed, during which time some of Ruthie's heirs (including Huntsman himself) appeared to embrace Exile's use of Ruthie's name and likeness. To this day, Huntsman admits that neither he nor any of Ruthie's other heirs has done anything to exploit her name and likeness.

Despite its superficial appeal, Exile's argument starts to falter when viewed in the context of how other jurisdictions handle the postmortem right of publicity. In states where legislatures have acted, "[t]he statutes define varying durations for the postmortem right, ranging from a maximum of 100 years in Indiana and Oklahoma to as short as 20 years in Virginia." McCarthy, *Rights of Publicity and Privacy* § 9:17. "The Tennessee statute says the right lasts as long as it is continually used." *Id.* "The Nebraska statute has no stated duration." *Id.* This shows, at minimum, that there is nothing about a person's right of publicity that inherently would cause it to cease to exist simply because it goes unused for twenty-plus years. *See Abdul-Jabbar*, 85 F.3d at 415 (noting that the right to publicity protects both the "right to exploit" and the "decision not to use").

The conclusion is similar in states where the right of publicity has been recognized and defined under the common law. In many states that now have statutes governing the postmortem right of publicity, the statutes do not on their face purport to create rights where none previously existed under the common law, but rather to supplement or clarify those common law rights. *See, e.g.*, Fla. Stat. § 540.08(7) ("The remedies provided for in this section shall be in addition to and not in limitation of the remedies and rights of any person under the common law against the invasion of his or her privacy."); Ind. Code § 32-36-1-20 ("The rights and remedies provided for in this chapter are supplemental to any other rights and remedies provided by law.") Meaning: the fact that statutes have been passed setting the duration of postmortem publicity rights does not

28

necessarily mean those rights had a shorter duration (or did not exist at all) under the common law. Of the remaining common law states, most have not clearly delineated the duration of right of publicity protection or decided when non-use might lead to abandonment. *See, e.g.*, *In re Estate of Reynolds*, 327 P.3d at 217; *Crowell*, 733 S.W.2d at 98–99. One exception, however, is *Hebrew University*, which held that Albert Einstein's right of publicity survived for up to fifty years after his death. *See Hebrew Univ. of Jerusalem v. Gen. Motors LLC*, 903 F. Supp. 2d 932, 942 (C.D. Cal. 2012), *vacated*, No. CV-10-3790-AB (JCX), 2015 WL 9563154 (C.D. Cal. Jan. 12, 2015).[11] The United States Court of Appeals for the Sixth Circuit has gone even further, affirming a permanent injunction with no temporal limitation against the defendant for violating a decedent's right of publicity. *See Herman Miller, Inc.*, 270 F.3d at 325–27. In other words, the Sixth Circuit apparently believed the right of publicity would survive in perpetuity. Thus, again, there is nothing about the passage of twenty-plus years that *per se* requires the Court to conclude Ruthie's rights to publicity and name and likeness have been abandoned.

Turning to Iowa law, Exile argues that Ruthie's publicity and name and likeness rights are analogous to trademarks, which are presumptively abandoned if not used for two years. *See* Iowa Code § 548.101(1)(a). The Court disagrees with this analogy. Although the right of publicity is similar to trademark in the sense of being a commercial right, it arises out of a person's name and identity, which "ha[ve] a life and a significance quite apart from the commercial realm." *Abdul-Jabbar*, 85 F.3d at 412. Publicity and name and likeness rights therefore implicate a broader array of interests than trademark, such as the "right to control if, when, and under what circumstances one's image is made public and subject to scrutiny." *Toffoloni v. LFP Publ'g Grp., LLC*, 572 F.3d 1201, 1206 (11th Cir. 2009); *see also Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 967 (10th Cir. 1996) ("Although publicity rights are related to laws preventing false endorsement, they offer substantially broader protection."). Publicity rights also reflect the investment a person makes throughout his or her lifetime to establish a unique and valuable identity and reputation, as well as the unfairness that would arise if third parties are given too much freedom to leverage that reputation for their own gain. *See, e.g.*, *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 837 (6th Cir. 1983) ("Certainly [] Carson's achievement has made him a

---

[11] As with the separate *Hebrew Univ.* decision cited in the preceding section, Judge Matz's ruling on the duration of the postmortem right of publicity was vacated by joint motion of the parties following settlement. *See* 2015 WL 9653154, at *1. The Court does not interpret this as casting doubt on the validity of his analysis.

celebrity which means that his identity has a pecuniary value which the right of publicity should vindicate . . . Vindication of the right will also tend to prevent unjust enrichment by persons such as appellee who seek commercially to exploit the identity of celebrities without their consent."). As the United States Supreme Court has explained, "[t]he rationale (for protecting the right of publicity) is the straightforward one of preventing unjust enrichment by the theft of good will. No social purpose is served by having the defendant get free some aspect of the plaintiff that would have market value and for which he would normally pay." *See Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 576 (1977) (quoting Kalven, *Privacy in Tort Law: Were Warren and Brandeis Wrong?*, 31 L. & Contemp. Prob. 326, 331 (1966)). For these reasons, some courts and commentators consider copyright—with, now, seventy years of protection—to be a better analogy for determining the duration of publicity rights. *See, e.g.*, *Hebrew Univ.*, 903 F. Supp. 2d at 942; *Presley's Est. v. Russen*, 513 F. Supp. 1339, 1355 n.10 (D.N.J. 1981). *See also Zacchini*, 433 U.S. at 576 (noting the overlap between the right of publicity and "the patent and copyright laws long enforced by this Court").

Stated differently, the common law recognizes that publicity rights serve both offensive and defensive purposes, with the former revolving around the affirmative right to capitalize on the value of one's name and likeness but the latter serving to prevent a third party from using the same without consent. The former bears a close relationship to trademark law, but the latter is broader: there are situations where someone like Ruthie's heirs reasonably might want to prevent a third party from using her name and likeness despite having no separate intent to use it themselves. Allowing publicity rights to be abandoned as easily as trademarks would undermine the broader goals of the common law right of publicity.

Applying a presumption of abandonment after only two years of non-use also would have other troubling implications, as it would give third parties broad latitude to use the names and likenesses of people who only recently died. Take, for example, legendary University of Iowa football coach Hayden Fry, who died in 2019. Under Exile's approach, a sports bar in Iowa City already could be calling itself "Hayden Fry's" and using Fry's distinctive name and likeness for marketing purposes unless Fry's heirs could prove that his estate had been exploiting his name and likeness since his death.

Ruthie herself provides a similarly compelling example. She was a captivating person who achieved some level of recognition (the parties dispute how much) through a combination of

creativity, independence, and strength. It is unsettling to think that a third party could have begun exploiting her reputation for the third party's own commercial gain in 1995, just two years after her death, without permission from her Estate or heirs. Yet this would be the result under Exile's approach. The Court is confident the Iowa Supreme Court would give more protection to the postmortem right of publicity.

The question, then, is *how much* more protection the Iowa Supreme Court would give. As with the issue of descendibility, Exile argues that the Court will engage in impermissible legislative decision-making if it allows the Estates' claims to proceed. In effect, Exile argues, the Court will be recognizing at least a twenty-five-year duration for publicity rights even though the Iowa Legislature has never spoken on the issue. Fair enough. But if the Court concludes the Estates do *not* have viable claims, it would be engaging in the same sort of "legislative" decision-making because it would mean the right of publicity has a duration of *no more than* twenty-five years even though, again, the Legislature has never spoken on the issue. Given that most states appear to recognize a postmortem right of publicity lasting thirty years or more, the intrusion on the legislative prerogative from adopting Exile's position is arguably worse than the intrusion from adopting the Estates' position.

To resolve this quandary, the Court has surveyed common law cases from other states and Iowa cases in analogous areas. This leads the Court to two conclusions: (1) the Iowa Supreme Court would not fix a set number of years for postmortem protection of the common law right of publicity, as any such bright-line rule is for the Iowa Legislature to decide; and (2) the Iowa Supreme Court nonetheless would conclude that a person's heirs can abandon, forfeit, or waive publicity rights, just as they can abandon, forfeit, or waive other property rights following the person's death. *See In re Estate of Warrington*, 686 N.W.2d at 203–04.

In reaching these conclusions, the Court recognizes that there is no perfect analogy for common law right of publicity or name and likeness claims, as such claims implicate a blend of interests from unfair competition, trademark, copyright, and right to privacy laws, among others. McCarthy, *Rights of Publicity and Privacy* § 1:8. These areas of law provide varying degrees of protection, often with unique conditions attached. The Court believes, however, that the closest analogy for publicity and name and likeness rights that are actively being used postmortem is trademark law, while the closest analogy for name and likeness rights *not* in active use is copyright.

As to the former, and as noted above, publicity rights are designed in part to serve an offensive purpose; i.e., to allow someone (or that person's heirs) to capitalize on the value of the person's name and likeness. As long as the name and likeness are in active commercial use, it bears a strong resemblance to trademark and therefore should have the same degree of protection. Meaning: the protection should apply for as long as there is active use. *See Arlington Specialties, Inc. v. Urb. Aid, Inc.*, 847 F.3d 415, 418 (7th Cir. 2017) ("Trademark protection does not expire, though, as long as the protected mark is being used in commerce to designate the origin of a product.") Accordingly, the Court predicts the Iowa Supreme Court would protect common law publicity and name and likeness rights postmortem for as long as they are in active use.

Unused publicity and name and likeness rights are different. As explained above, presumptive abandonment after two years seems far too short given the privacy-related interests that underlie publicity-type rights. *See Abdul-Jabbar*, 85 F.3d at 415; s*ee also Martin Luther King, Jr., Ctr. for Soc. Change, Inc. v. Am. Heritage Prod., Inc*., 296 S.E.2d 697, 706 (Ga. 1982) (similar). A better analogy for unused publicity and name and likeness rights is therefore common law and statutory copyright. *See Hebrew Univ.*, 903. F. Supp. 2d at 942. Under the common law, courts held that a person had the right in perpetuity to decide whether and when to publish an unpublished manuscript. *See Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 9 F.4th 1167, 1175 (9th Cir. 2021) ("Common law provides a perpetual copyright for *unpublished* works, but Congress alone determines the length of a monopoly for *published* works."). An unused name and likeness is somewhat similar to an unpublished manuscript: it is the story of a person's life that, for whatever reason, the person and her heirs have chosen not to use commercially. That person (or her heirs) nonetheless should have extensive control over whether and when the story is used for commercial gain. *See Hirsch v. S.C. Johnson & Son, Inc.*, 280 N.W.2d 129, 132 (Wis. 1979) (describing the "right of control of the commercial aspects of one's identity").

Again, however, the analogy is imperfect. Unused publicity rights should not be protected forever. *Cf. Pirone v. MacMillan, Inc*., 894 F.2d 579, 580 (2d Cir. 1990) (evaluating claims of Babe Ruth's publicity, stating that baseball's great players are "public icons" and that baseball, "to an extent, [] belongs to all of us"); *see also* McCarthy, *Rights of Publicity and Privacy* § 9:16 (recommending a fixed duration to "avoid descendants or heirs unto the nth generation reaping the commercial rewards of a distant and famous ancestor"). Accordingly, and in the absence of clear legislative guidance, the Court predicts that the Iowa Supreme Court would use common law

principles like abandonment, forfeiture, waiver, acquiescence, and consent to strike the right balance between providing enough protection to reflect the interests underlying unused publicity-type rights without making a person's name and likeness off-limits forever. The Court therefore turns to those common law principles.

2. <u>The Jury Must Decide Abandonment, Acquiescence, and Similar Issues.</u>

"Abandonment is shown by proof that the owner intends to abandon the property and has voluntarily relinquished all right, title and interest in the property." *Benjamin v. Linder Aviation, Inc.*, 534 N.W.2d 400, 406 (Iowa 1995). "Abandonment is an affirmative defense and must be established by clear and unequivocal evidence." *Page v. Cooper*, 53 N.W.2d 765, 767 (Iowa 1952). "To establish an abandonment of property, actual relinquishment of the property accompanied by the intention to abandon must be shown." *Est. of Pepper v. Whitehead*, No. 4:09-CV-524, 2012 WL 13088900, at *5 (S.D. Iowa Oct. 31, 2012). "If there is no expressed intent, the intent may be inferred from the acts of the property owner." *Id.*

"Estoppel by acquiescence occurs when a person knows or ought to know of an entitlement to enforce a right and neglects to do so for such time as would imply an intention to waive or abandon the right." *Garrett v. Huster*, 684 N.W.2d 250, 255 (Iowa 2004) (quoting *In re Marriage of Fields*, 508 N.W.2d 730, 731 (Iowa 1993)). "Although this doctrine bears an 'estoppel' label, it is, in reality, a waiver theory." *Markey v. Carney*, 705 N.W.2d 13, 21 (Iowa 2005) (quoting *Westfield Ins. Cos. v. Econ. Fire & Cas. Co.*, 623 N.W.2d 871, 880 (Iowa 2001)). "Unlike equitable estoppel, estoppel by acquiescence does not require a showing of detrimental reliance or prejudice." *Id.* "Estoppel by acquiescence is based on an examination of the individual's actions who holds the right in order to determine whether that right has been waived. It advances a policy of stability and conclusiveness." *Davidson v. Van Lengen*, 266 N.W.2d 436, 439 (Iowa 1978). The party asserting the defense of estoppel by acquiescence bears the burden of proof by clear and convincing evidence. *Markey*, 705 N.W.2d at 21.

The evidence of abandonment or estoppel by acquiescence here is mixed. On one hand, Ruthie did not exploit her name and likeness during the last twenty years or so of her life, nor did Frank or any of her other heirs attempt to do so after her death. Indeed, her rights of publicity and name and likeness were not mentioned in the Final Report of either her or Frank's Estate. Moreover, despite learning about Exile's use of her name and likeness as early as 2013, some of Ruthie's heirs appeared to embrace it. This lawsuit was not filed until 2020, and only through the

efforts of a somewhat distant relative. These facts provide support for abandonment, acquiescence, or consent.

On the other hand, however, mere non-use is not the same as an "intention to abandon." *See Page*, 53 N.W.2d at 767. Moreover, given disputed evidence on the topic, the Court must assume for present purposes that Exile did not ask for permission from Ruthie's heirs to use her name and likeness, much less obtain affirmative consent to do so. *See Benjamin*, 534 N.W.2d at 408 (affirming finding of fact that property was not abandoned because there was no indication the finder attempted to locate or notify potential owners). And while the alleged acquiescence of Ruthie's heirs beginning in 2013 is relevant, the Estates credibly argue that it resulted from confusion and uncertainty about the right of publicity and probate law—i.e., what rights did Ruthie's heirs have, and which heirs had the right to raise them?—as opposed to consent or an "intention to abandon." In these circumstances, and setting aside, for now, the statute of limitations, the Court cannot conclude as a matter of law that Exile has shown by clear and unequivocal evidence that Ruthie's heirs abandoned her name and likeness and right of publicity or acquiesced in Exile's use of the same. *See Page*, 53 N.W.2d at 767; *see also Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 688 F. Supp. 2d 1148, 1162–63 (D. Nev. 2010) (denying summary judgment in light of conflicting evidence regarding forfeiture of publicity rights). Instead, these are questions for the jury to decide. *See Benjamin*, 534 N.W.2d at 404 (holding that abandonment "is a fact question").

The Court anticipates providing the jury with factors that it may consider in evaluating defenses like abandonment, consent, and estoppel by acquiescence. The Court of course will welcome the parties' input on these factors in their respective proposed jury instructions. For present purposes, however—and subject to addition, subtraction, or modification upon seeing the parties' proposals—the Court identifies the following: (1) the length of time between Ruthie's death and the Estates' attempt to enforce her publicity rights; (2) the extent to which Ruthie's Estate or heirs had the opportunity to assert or exploit her publicity rights during that period; (3) the extent to which Ruthie's Estate or heirs perceived her publicity rights to have value; (4) the reasons proffered by the Estates for the delay in enforcing her publicity rights; (5) the extent to which Exile communicated, or attempted to communicate, with Ruthie's heirs before beginning to use her name and likeness; (6) the substance of any such communications; (7) the manner in which

Exile is using Ruthie's name and likeness; and (8) the connection between Ruthie and the heirs who are involved in attempting to enforce her publicity rights.

The seventh and eighth factors deserve explication. As to the seventh, in the Court's view, a finding of abandonment or acquiescence is less likely to be appropriate if a third party is using the decedent's name and likeness in a manner that reasonably might cause embarrassment or humiliation for the person's relatives. Suppose, for example, a third party opens a burlesque night club in which a performer dressed like Ruthie and wearing a "Ruthie Bisignano" nametag begins performing a striptease. Ruthie's relatives reasonably might decide that although they did not intend to exploit her publicity rights for commercial gain, they also did not intend—through abandonment, acquiescence, or otherwise—to allow a third party to begin exploiting those rights in such a tawdry fashion.

As to the same factor, it is also relevant whether the third party has wholesale adopted the decedent's name and persona, or if the third party instead merely used the decedent as an inspiration to which the third party added its own considerable creative flair. A reasonable juror might conclude that the decedent's heirs are less likely to have abandoned the right of publicity as it pertains to the decedent's literal name and life story, but more likely to have abandoned it in the context of what copyright law might consider a derivative work. *See Mulcahy v. Cheetah Learning LLC*, 386 F.3d 849, 852–53 (8th Cir. 2004).

As to the eighth factor—the connection between Ruthie and the heir(s) who are involved in attempting to enforce her publicity rights—a reasonable juror could conclude that a direct relative like a spouse or child is less likely to give up the right to control a person's name and likeness. By contrast, a distant relative's involvement in enforcing the rights is more suggestive of abandonment, particularly if: (a) there are closer relatives who are not seeking to enforce the rights; and/or (b) there is a difference of opinion among equally distant surviving relatives about whether try to enforce the rights.

The Court cannot predict how the jury will apply these factors. The Court does predict, however, that the Iowa Supreme Court would decide it is a call for the jury to make in the first instance. The Court therefore DENIES Exile's motion for summary judgment (ECF 77) on the issue of standing.

## VII.   LEGAL ANALYSIS: STATUTE OF LIMITATIONS ON THE ESTATES' COMMON LAW CAUSES OF ACTION.

### A.   The Iowa Supreme Court Would Adopt a Five-Year Statute of Limitations for the Estates' Common Law Causes of Action.

The Court turns next to Exile's argument that all four of the Estates' common law causes of action are barred by the statute of limitations. The Court first must decide what the statute of limitations *is* for those causes of action. Exile argues they are based upon the right to privacy and thus are governed by the two-year statute of limitations in Iowa Code § 614.1(2). The Estates, by contrast, urge the Court to apply the five-year limitations period in Iowa Code § 614.1(4), which applies, *inter alia*, to actions "brought for injuries to property . . . and all other actions not otherwise provided for in this respect. . . ."

The Iowa Supreme Court has not directly addressed this issue, although it has recognized that "[i]n order to determine the appropriate statute of limitations for a cause of action, we look to the foundation of the action." *Legg v. West Bank*, 873 N.W.2d 763, 774 (Iowa 2016); *accord, e.g.*, *Kostoglanis v. Yates*, 956 N.W.2d 157, 159 (Iowa 2021). "This determination turns on the nature of the right sued upon and not on the elements of relief sought for the claim." *Venard v. Winter*, 524 N.W.2d 163, 165 (Iowa 1994). "When disagreement arises as to which of the several periods of limitation contained in Iowa Code section 614.1 is applicable, [the Court] must determine, as best [it] can, which of the types of actions described in the statute most nearly characterizes the action before the court." *Scott v. City of Sioux City*, 432 N.W.2d 144, 147 (Iowa 1988).

In the preceding section, the Court concluded that the Iowa Supreme Court would treat Ruthie's publicity rights as <u>property</u> rights, not <u>personal</u> rights, because they involve commercial interests in the sense contemplated by section 652A of the Restatement (Second) of Torts and other persuasive authorities. The Iowa Supreme Court has held that the five-year limitations period set forth in Iowa Code § 614.1(4) typically applies "to actions brought to recover for injuries to interests that are essentially 'proprietary in nature.'" *Scott*, 432 N.W.2d at 147 (quoting *Clark v. Figge*, 181 N.W.2d 211, 216 (Iowa 1970)). The Court therefore concludes the Iowa Supreme Court would apply the five-year period here. *See id.* It does not matter that the claims arise out of the use of Ruthie's identity or name and likeness, as the "foundation of the action" is a property right, not a personal right. *See id.*

This conclusion is consistent with case law from other jurisdictions. The District of Nevada, for example, compared the right of publicity under Nevada law to an unfair competition

claim for statute of limitations purposes because of the commercial nature of the tort. *Sears v. Russell Rd. Food & Beverage, LLC*, 460 F. Supp. 3d 1065, 1072 (D. Nev. 2020). It therefore applied the longer limitations period applicable to unfair trade practices claims rather than the shorter period applicable to defamation or slander. *Id.* The Virginia Supreme Court reached essentially the same conclusion, holding that a claim for appropriation of name and likeness involved "a species of property right" and therefore was governed by a longer limitations period despite arising under the umbrella term "right of privacy." *Lavery v. Automation Mgmt. Consultants, Inc.*, 360 S.E.2d 336, 342 (Va. 1987). Likewise, a New Jersey appellate court used the longer statute of limitations applicable to property rights because "insofar as plaintiffs' claim is based on the appropriation of their likeness and name for defendant's commercial benefit, it is an action for invasion of their 'property' rights and not one for 'injury to the person.'" *Canessa*, 235 A.2d at 76.

Contrary to Exile's position, the Iowa Supreme Court did not hold differently in *In re Marriage of Tigges* when it stated that invasion of privacy claims are governed by the two-year statute of limitations. 758 N.W.2d 824, 830 (Iowa 2008). *In re Marriage of Tigges* involved an intrusion upon seclusion claim, not a right of publicity or appropriation of name and likeness claim. Given the recognition in the Restatements that right of publicity claims are different than other invasion of privacy claims, the Court predicts the Iowa Supreme Court would treat right of publicity and name and likeness claims as involving injuries to property, not to person. *See, e.g.*, *Ventura*, 65 F.3d at 730 ("The right to publicity protects pecuniary, not emotional, interests."). It follows that the Iowa Supreme Court would apply the five-year limitations period to such claims, notwithstanding *In re Marriage of Tigges*.

Having concluded that there is an applicable statute of limitations, the Court will not separately evaluate the defense of laches on the Estates' common law causes of action. "Laches is a gap-filling doctrine, and where there is a statute of limitations, there is no gap to fill." *SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 580 U.S. 328, 335 (2017).

B. *The Estates' Common Law Claims Are Time-Barred as to Damages Before June 1, 2015, But Not Thereafter.*

The next question is how to apply the five-year limitations period. Exile argues that it began to run when it first started selling Ruthie beer in 2012 or, at the latest, in 2013 or 2014 when Tony Bisignano and Huntsman, respectively, admittedly became aware of Exile's use of Ruthie's name and likeness. The Estates, by contrast, argue the statute did not begin to run until Huntsman learned

in 2019 that Exile did not have permission from Ruthie's heirs to use her name and likeness. The Estates also argue, partly in the alternative, that Exile's torts are continuing and thus the statute of limitations at most affects only the period for which damages are available, not the viability of the Estates' claims altogether. Finally, if nothing else, the Estates argue the limitations period re-started in 2016 when Exile changed its portrayal of Ruthie to begin emphasizing her life story, independence, and strength, in contrast to prior branding of her as a "pin-up" model.

Sorting through the traffic, the Court first concludes that the discovery rule is of no assistance to the Estates in the circumstances presented here. The Iowa Supreme Court has never addressed the statute of limitations in right-of-publicity-type claims, much less decided whether the discovery rule applies to them. It also has not definitively decided whether the discovery rule applies in defamation claims, which are arguably analogous. *See Linn v. Montgomery*, 903 N.W.2d 337, 343 (Iowa 2017). Even if the discovery rule applies, however, it does not affect the outcome here because Huntsman had knowledge of Exile's use of Ruthie's name and likeness in 2014, more than five years prior to filing suit.

Huntsman argues that the timing of his knowledge is not determinative because he is not "the Estate" and Ruthie had other heirs who did not learn until after 2014 about Exile's use of her name and likeness. This argument is unpersuasive. Huntsman is the Administrator of the Estates and the motivating force behind their reopening in 2020. The Court therefore will impute his knowledge to the Estates for statute of limitations purposes. *See Cedar Rapids Lodge & Suites, LLC v. JFS Dev., Inc.*, No. 09-CV-175-LRR, 2012 WL 33004, at *13–14 (N.D. Iowa Jan. 6, 2012), (plaintiff-entity was on notice of potential claim based on knowledge of officers), *aff'd*, 789 F.3d 821 (8th Cir. 2015). Holding otherwise would mean the statute of limitations could never run under Iowa law against a closed estate.

Huntsman also argues that it was not until 2019 that he learned from Ruthie's heirs that Exile never obtained permission to use her name and likeness, and thus he did not "discover" the cause of action until that year. Again, the Court disagrees. Under Iowa law, "the limitations period begins not with actual knowledge, but rather once the plaintiff is placed on inquiry notice." *Bandstra v. Covenant Reformed Church*, 913 N.W.2d 19, 44 (Iowa 2018). "A party is placed on inquiry notice when a person gains sufficient knowledge of facts that would put that person on notice of the existence of a problem or potential problem. On that date, a person is charged with knowledge of facts that would have been disclosed by a reasonably diligent investigation." *Buechel*

*v. Five Star Quality Care, Inc.*, 745 N.W.2d 732, 736 (Iowa 2008) (internal citation omitted). "Once a person is aware that a problem exists, the person has a duty to investigate 'even though the person may not have knowledge of the nature of the problem that caused the injury.'" *Id.* (quoting *Sparks v. Metalcraft, Inc.*, 408 N.W.2d 347, 351–52 (Iowa 1987)).

Here, Huntsman learned no later than 2014 that Exile was using Ruthie's name and likeness. As Exile's use of her name and likeness is the core of this lawsuit, he obviously views it as a "problem." Huntsman also knew, as of 2014, that *he* had never authorized such use. This combination of facts was enough to put him on inquiry notice as of 2014 that there was a "potential problem" for which he had a "duty to investigate." *Buechel*, 745 N.W.2d at 737 (holding that plaintiffs were on inquiry notice because of their awareness that "an unusual event had occurred"); *Ranney v. Parawax Co.*, 582 N.W.2d 152, 155 (Iowa 1998) (holding that plaintiff was on inquiry notice once he knew of a *possible* claim). The fact that it was only in 2019 that a conversation finally occurred between Huntsman and Ruthie's other heirs does not mean the statute did not start running sooner. The Estates have offered no reason why Exile could be held responsible for that delay, nor can the Court identify one through independent review of the record. The Court therefore grants Exile's motion for summary judgment (ECF 83) as it relates to injuries prior to June 1, 2015, which is five years before the filing of the Estates' lawsuit.

The next question is whether the Estates' failure to sue within five years of being placed on inquiry notice means they have no viable common law claims at all, or if the Court instead should treat Exile's alleged torts as "continuing" for purposes of Iowa law. "[W]here the wrongful act is continuous or repeated, so that separate and successive actions for damages arise, the statute of limitations runs as to these latter actions at the date of their accrual, not from the date of the first wrong in the series." *Hegg v. Hawkeye Tri-Cnty. REC*, 512 N.W.2d 558, 559 (Iowa 1994). "Recovery is limited to those actions accruing during the statutory period, in this case five years, preceding the inception of the current action for damages." *Id.* The Iowa Supreme Court appears never to have considered whether the continuing wrong doctrine applies to the right of publicity or other torts falling under the umbrella term "right to privacy."

In similar circumstances, courts in other jurisdictions have borrowed the "single publication rule" from defamation law. *See, e.g.*, *Christoff v. Nestle USA, Inc.*, 213 P.3d 132, 137 (Cal. 2009). Meaning: "the first time that an offending item is published, the [five-year] statute of limitations . . . begins to run and the dissemination of that same offending item thereafter does not

give rise to a new cause of action, nor does it refresh the running of the statute of limitations." *Zoll v. Jordache Enters., Inc.*, No. 01 CIV. 1339 (CSH), 2002 WL 31873461, at *7 (S.D.N.Y. Dec. 24, 2002). In applying the single publication rule, courts "must identify what constitutes a 'single integrated publication' within the meaning of the rule, such as the printing and distribution of a particular issue of a newspaper, magazine, or book." *Christoff*, 213 P.3d at 137 (internal citation omitted). "However, a republication of the plaintiff's likeness can constitute a new cause of action if the publication is altered so as to reach a new audience or promote a different product." *Blair v. Nevada Landing P'ship*, 859 N.E.2d 1188, 1194 (Ill. App. Ct. 2006).

When applying the single publication rule in right of publicity cases, courts have had to make difficult decisions about what constitutes a "single integrated publication." In *Blair v. Nevada Landing Partnership*, for example, the Illinois Court of Appeals concluded that a steakhouse's use of the plaintiff's photograph on billboards, menus, and other marketing materials over a nine-year period constituted a "single overt act" because each use of the photograph was designed for the same purpose: "to advertise the Buckingham Steakhouse, and targeted a single audience, casino patrons." *Id.* at 1193. *Blair* therefore held the plaintiff's claims were time-barred. *Id*. at 1195. Exile asks this Court to apply the same logic and reach the same conclusion here.

Although the Court is reasonably confident the Iowa Supreme Court would apply the single publication rule to right of publicity cases, existing precedent suggests it would not interpret the rule as broadly as *Blair*. In *Kiner v. Reliance Insurance Company*, the Iowa Supreme Court held that the statute of limitations begins to run in defamation cases "on the date of publication." 463 N.W.2d 9, 13 (Iowa 1990). This sounds like the "single publication rule." However, *Kiner* went on to explain that "[e]very publication or repetition of defamatory matter constitutes a claim which is separate and independent from any claims arising out of the original publication." *Id.* at 14. This appears to be more plaintiff-friendly than the rule applied in *Blair* because there is no apparent requirement in *Kiner* for the subsequent publication to be designed to "reach a new audience or promote a different product." *Blair*, 859 N.E.2d at 1194. Instead, the mere fact of republication, standing alone, is enough to give rise to new claims. *Kiner*, 463 N.W.2d at 14. This Court must follow *Kiner*, not *Blair*, and therefore holds that the Estates' common law claims are timely as to Exile's use of Ruthie's name and likeness on product sales after June 1, 2015.

The Court notes, in any event, that the Estates have presented sufficient evidence to survive summary judgment even under *Blair*. When viewed in the light most favorable to the Estates, the

record shows that Exile made substantial changes to its portrayal of Ruthie in labels and marketing materials starting in 2016 to make her less of a "pin-up" model and more of a real person with a real story. This is the type of change that even cases following *Blair* would treat as sufficient to give rise to new causes of action. *See, e.g.*, *Yeager v. Innovus Pharms., Inc.*, No. 18-CV-397, 2019 WL 447743, at *6 (N.D. Ill. Feb. 5, 2019) (distinguishing *Blair* and concluding that advertisements were directed at new audiences through new channels). Accordingly, even if the Court has erred in its interpretation and application of *Kiner*, the statute of limitations still would not bar Ruthie's claims from 2016 to the present.[12]

## VIII.   LEGAL ANALYSIS: LANHAM ACT.

In addition to their state common law causes of action, the Estates bring a claim for false association[13] under section 43(a)(1)(A) of the Lanham Act, which is codified at 15 U.S.C. § 1125(a)(1)(A). In relevant part, section 43(a)(1) states:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> > (A) is likely to cause confusion, or to cause mistake, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .
>
> shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

"To prove a violation of § 43(a)(1)(A) in a false [association] case, a plaintiff must show that: (1) its mark is legally protectable; (2) it owns the mark; and (3) the defendant's use of the mark to identify its goods or services is likely to create confusion concerning the plaintiff's sponsorship or approval of those goods or services." *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1014 (3d Cir. 2008).

---

[12] At trial, the Court will consider using a special interrogatory to determine whether the jury believes Exile's marketing of Ruthie in 2016 and later years constitutes "republication" under the *Blair* test. This would allow the Court and parties to have an accurate measure of damages (if any) even if an appellate court later decides the Court should have followed *Blair*.

[13] The parties—and many courts—use the term "false association" interchangeably with "false endorsement" when talking about claims under section 43(a)(1)(A) of the Lanham Act. The Court is unable to discern any difference between the two. For simplicity, this Order will simply use the term "false association."

Exile argues that the Estates lack standing to bring their Lanham Act claim and that any such claim is barred by the affirmative defenses of laches and abandonment. (ECF 81; ECF 83.) Exile also argues that the Estates have failed as a matter as a matter of law to prove likelihood of confusion. (Id.) Conversely, the Estates ask the Court to grant partial summary judgment in *their* favor because, in their view, there is no genuine dispute of material fact as to any element of their Lanham Act claim. (ECF 89.)

A.   *The Estates Have Standing to Bring Lanham Act Claims.*

In *Lexmark International, Inc. v. Static Control Components, Inc.*, the United States Supreme Court held that a plaintiff bringing a claim for false advertising under section 43(a)(1)(B) of the Lanham Act—which, importantly, is *not* the claim the Estates are pursuing here—must "show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." 572 U.S. 118, 133 (2014). Exile argues that the same requirement exists for false association claims under section 43(a)(1)(A). It further argues the Estates cannot satisfy this requirement because they have never made commercial use of Ruthie's name and likeness and therefore have never lost business due to Exile's use of the same. Thus, Exile argues, the Estates lack standing under *Lexmark* to bring their Lanham Act claim.

"The Eighth Circuit has not yet spoken on whether this statutory standing test [from *Lexmark*] also applies to false endorsement cases, given that a false advertising claim was at issue in *Lexmark*." *Copperhead Agric. Prod., LLC v. KB Ag Corp., LLC*, No. CIV.18-4127, 2019 WL 4673197, at \*27 (D.S.D. Sept. 25, 2019). Some courts in other jurisdictions have applied the *Lexmark* test to false association claims. *See, e.g.*, *Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 711–12 (4th Cir. 2016); *Martin v. Wendy's Int'l, Inc.*, 183 F. Supp. 3d 925, 932 n.4 (N.D. Ill. 2016) ("The plaintiff in *Lexmark* brought only a false advertising claim under 43(a)(1)(B), but a number of federal courts have applied *Lexmark*'s standing analysis to claims arising under 43(a)(1)(A) as well." (citing cases)). Other courts, by contrast, have limited the *Lexmark* test to false advertising claims. *See, e.g.*, *Souza v. Exotic Island Enters., Inc.*, 68 F.4th 99, 109–20 (2d Cir. 2023) (applying *Lexmark* to false advertising claim but deciding false association claim on the merits); *Longoria v. Kodiak Concepts, LLC*, 527 F. Supp. 3d 1085, 1106–12 (D. Ariz. 2021) (same). The Court finds the latter group of cases more persuasive than the former and therefore

42

concludes that a plaintiff in a false association case does not have to prove lost business as a result of the defendant's conduct to have standing under the Lanham Act.

*Longoria v. Kodiak Concepts, LLC* illustrates why the Court reaches this conclusion. There, a strip club allegedly used the plaintiffs' names and likenesses for marketing purposes without consent, prompting the plaintiffs to sue for false association and false advertising under the Lanham Act. *Id.* at 1093. *Longoria* dismissed the false advertising claims for lack of standing under *Lexmark* because the plaintiffs did not operate their own strip clubs and therefore did not lose business due to the defendant's use of their names and likenesses. *Id.* at 1111. As *Longoria* explained, "Plaintiffs and Defendants do not share the same consumers. Defendant's consumers are potential patrons of strip clubs. If any of these consumers chose to visit Defendant's strip club because they were deceived into believing that one or more Plaintiffs endorsed the club and/or worked there, this might have taken business away from another strip club, but not from Plaintiffs." *Id.* By contrast, *Longoria* allowed the false association claims to proceed to trial after carefully analyzing the merits. *Id.* at 1106–10.

There was good reason for *Longoria* not to apply the *Lexmark* test to the false association claim. The false association provisions of the Lanham Act are designed, among other things, "to reserve the exclusive right to grant or deny permission to those who wish to use [a person's identity] to promote unspecified products in the future." *Facenda*, 542 F.3d at 1019; *see also Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1068 (9th Cir. 2015) ("A celebrity whose endorsement of a product is implied through the imitation of a distinctive attribute of the celebrity's identity, has standing to sue for false endorsement under section 43(a) of the Lanham Act." (quotation omitted)). It would not make sense to require plaintiffs to use their names and likenesses in a line of business they do not want to be associated with before they may sue a third party in that same line of business. Or, to put it more bluntly, the plaintiffs in *Longoria* should not have been required to open their own strip clubs just to have standing to sue the defendant for false association under the Lanham Act.

This is not to say that *Lexmark* serves no purpose in false endorsement claims. The overarching holding of *Lexmark* is that courts must consider both the "zone of interests protected by the law invoked" and "proximate causality" between conduct and injury when deciding whether a plaintiff has standing. 572 U.S. at 129. There is no reason to believe these two principles are irrelevant to false association claims; instead, "false association claims, while indeed subject to

*Lexmark*'s zone of interests and proximate causation requirements, implicate other Lanham Act interests different from those relevant to false advertising claims such that the manner in which *Lexmark*'s analysis applies will differ as well." *Red River Bancshares, Inc. v. Red River Emps. Fed. Credit Union*, No. CV 17-1370, 2019 WL 4727857, at *5 (W.D. La. Sept. 26, 2019). In other words, false association claims involve a different "zone of interest" and require a different proximate cause analysis. *See Lexmark*, 572 U.S. at 130 ("[T]he breadth of the zone of interests varies according to the provisions of law at issue. . . ." (quoting *Bennett v. Spear*, 520 U.S. 154, 163 (1997))).

Cases before and after *Lexmark* recognize that people have sufficient interests in their names and likenesses to fall within the "zone of interest" protected by section 43(a)(1)(A) of the Lanham Act. *See, e.g.*, *Geiger v. Abarca Fam. Inc.*, No. 3:21CV771 (DJN-EWH), 2022 WL 4242838, at *8 (E.D. Va. July 29, 2022) (concluding that the "zone of interest" test was satisfied where plaintiffs' images were allegedly used to create the false impression of their involvement in defendant's business), *report and recommendation adopted*, NO. 3:21CV771 (RCY), 2022 WL 4241649 (E.D. Va. Sept. 14, 2022); *Ullah v. Linkenauger*, No. 1:20CV00634AJTJFA, 2020 WL 9459338, at *5–6 (E.D. Va. Oct. 2, 2020); *Maremont v. Susan Fredman Design Grp., Ltd.*, 772 F. Supp. 2d 967, 971 (N.D. Ill. 2011) ("False endorsement occurs when a person's identity is connected with a product or service in such a way that consumers are likely to be misled about that person's sponsorship or approval of the product or service." (quoting *Stayart v. Yahoo! Inc.*, 651 F. Supp. 2d 873, 880–81 (E.D. Wis. 2009))). The same conclusion is appropriate here: the Estates have sufficient interest in Ruthie's name and likeness to fall within the "zone of interest" protected by section 43(a)(1)(A). *See Fifty-Six Hope Rd. Music*, 778 F.3d at 1068 (affirming jury verdict under the Lanham Act against third party for misappropriating deceased musician's name and likeness).

Whether Exile's conduct has proximately caused a commercial injury is a closer call. Some cases hold that the mere desire to prevent a third party from using someone's name is not enough to create Lanham Act standing. *See Stayart*, 651 F. Supp. 2d at 882 ("[T]he 'emotional desire to prevent others from using' [the plaintiff's] name 'does not create Lanham Act standing.'" (quoting *Dovenmuehle v. Gilldorn Mortg. Midwest Corp.*, 871 F.2d 697, 701 (7th Cir. 1989))). Instead, the plaintiff must show "that he has sufficiently commercialized his name and image to establish a market presence and that his opportunities to independently market his image and name has been

adversely affected by the false association created by Defendants' conduct." *Ullah*, 2020 WL 9459338, at *6; *see also Maremont*, 772 F. Supp. 2d at 971 (concluding that plaintiff had standing because "she was engaged in the commercial marketing of her skills" and "allege[d] a commercial injury based on Defendants' deceptive use of her name and likeness"). If the Eighth Circuit would follow the logic of these cases, the Estates would not have standing.

Other cases, however, appear to treat it as self-evident that there has been a cognizable injury under the Lanham Act when someone's name and likeness are used to sell a product without that person's consent even if the name is not otherwise in commercial use. In *Facenda v. N.F.L. Films, Inc.*, for example, the Third Circuit held that the estate of a deceased football announcer established sufficient facts to survive summary judgment on a claim against the National Football League for using his voice in a video game more than two decades after his death. *See* 542 F.3d at 1023–24. There is nothing in *Facenda* to suggest the announcer's estate was using his voice for other commercial purposes, yet the Third Circuit addressed the Lanham Act claim on the merits. *See id.* Similarly, in *Abdul-Jabbar v. General Motors Corp.*, the Ninth Circuit went straight to the merits of former professional basketball player Kareem Abdul-Jabbar's false association claim arising out of the defendant's use of his birth name, Lew Alcindor, which he had not used for any purpose—much less a *commercial* purpose—for more than ten years. 85 F.3d at 411.

This Court agrees with the implicit recognition in *Facenda* and *Abdul-Jabbar* that there has been a cognizable injury under the Lanham Act when a person's name and likeness is used for commercial purposes without consent even if the name and likeness is not otherwise in commercial use. Unauthorized use results, *inter alia*, in loss of control over the name and likeness, which is inherently a form of "commercial injury" if the defendant is using the name and likeness for commercial gain. *See Neva, Inc. v. Christian Duplications Int'l, Inc.*, 743 F. Supp. 1533, 1551 (M.D. Fla. 1990) ("Plaintiffs have been injured by being deprived of their right to control the use of a commercially valuable asset, the name of Alexander Scourby."). It should not matter whether the plaintiff is making separate commercial use of the name or likeness or simply wishes for it not to be used in the commercial realm at all. *See* McCarthy, *Rights of Publicity and Privacy* § 5:33 ("In the authors' view, there should be no requirement that a person have previously 'commercialized' her identity in order to have standing to sue. Lanham Act § 43(a)(1)(A) contains no such requirement that the plaintiff has in the past 'commercialized' her identity.").

This conclusion is fully consistent with the larger context in which *Lexmark* was decided. The Supreme Court included the proximate cause test in the standing analysis to help protect against suits "for alleged harm that is 'too remote' from the defendant's unlawful conduct." 572 U.S. at 133. "For example, while a competitor who is forced out of business by a defendant's false advertising generally will be able to sue for its losses, the same is not true of the competitor's landlord, its electric company, and other commercial parties who suffer merely as a result of the competitor's inability to meet its financial obligations." *Id.* at 134 (cleaned up). Any such harm "is purely derivative of 'misfortunes visited upon a third person by the defendant's acts.'" *Id.* at 133 (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268–69 (1992)).

Here, there is nothing "derivative" about the harm a person suffers from unauthorized use of name and likeness. Whether the injury is characterized as involving "goodwill," "reputation," "control," "lost royalties," or any number of other possible labels—*see, e.g., ADT LLC v. Vivint, Inc.*, No. 17-CV-80432, 2017 WL 5640725, at *4 (S.D. Fla. Aug. 3, 2017)—the injury is directly related to the defendant's conduct and arises in a commercial setting. This is enough to establish standing under the Lanham Act. *See* McCarthy, *Rights of Publicity and Privacy* § 5:33.

B. *The Estates Abandoned Ruthie's Name and Likeness for Lanham Act Purposes.*

The Court previously concluded that Ruthie's name and likeness were not *per se* abandoned under Iowa law for purposes of the Estates' common law publicity-type claims. The Court reached this conclusion because, *inter alia*, there is no inherent expiration date for the common law right of publicity; instead, many states have recognized name and likeness protection extending thirty years or more after death. Moreover, under Iowa law, non-use is not *per se* equivalent to abandonment.

The abandonment analysis is different under the Lanham Act. *See Imperial Tobacco Ltd., Assignee of Imperial Grp. PLC v. Philip Morris, Inc.*, 899 F.2d 1575, 1581 (Fed. Cir. 1990). In contrast to the common law, Congress provided a statutory definition of "abandonment" in the Lanham Act, stating that a mark "shall be deemed to be 'abandoned' . . . [w]hen its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment." 15 U.S.C. § 1127. "'Use' of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in the mark." *Id.*

46

Here, the undisputed facts show that neither the Estates nor Ruthie's heirs have attempted to use her name and likeness in the thirty years since her death in 1993. This is ten times longer than necessary to establish a prima facie case of abandonment under the Lanham Act. Moreover, although Huntsman, the Estates' Administrator, says he believes Ruthie's legacy should be kept alive, he admits the Estates have not "completely formulated" plans for doing so. Instead, at most, his testimony provides only vague hints about what the Estates might do. In these circumstances, there has been "abandonment" as a matter of law under the Lanham Act. *See Silverman v. CBS Inc.*, 870 F.2d 40, 47 (2d Cir. 1989). "[A] proprietor may not protect a mark if he discontinues using it for more than 20 years and has no plans to use or permit its use in the reasonably foreseeable future." *Id.*; *see also Pro. Serv. Indus., Inc. v. PSI Inspection, Inc.*, 19 F. App'x 457, 458 (8th Cir. 2001) (affirming finding of abandonment based on five years of non-use).

In arguing otherwise, the Estates rely heavily on *Abdul-Jabbar* for the proposition that a person's name and likeness never can be abandoned. For two reasons, the Court disagrees. First, the plaintiff in *Abdul-Jabbar* was still alive, and the Ninth Circuit merely held that "[a] proper name [] cannot be deemed 'abandoned' **throughout its possessor's life**, despite his failure to use it, or continue to use it, commercially." 85 F.3d at 411 (emphasis added). The Court does not interpret *Abdul-Jabbar* as holding that a person's name can never be abandoned for Lanham Act purposes even after that person dies, nor do the Estates cite any other on-point authority for that proposition.

Second, it would undermine the plain language of the Lanham Act to conclude that a person's name and likeness cannot be abandoned postmortem. For reasons explained elsewhere in this Order, a person's name and likeness is more akin to a commercial property right than a personal right in circumstances like those presented here. Indeed, this is a crucial premise of the Estates' Lanham Act claim, as they cannot have a viable cause of action unless Ruthie's name and likeness is a protectible "mark" in commerce. *See, e.g.*, *White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1400 (9th Cir. 1992) ("In cases involving confusion over endorsement by a celebrity plaintiff, 'mark' means the celebrity's persona."), *as amended* (Aug. 19, 1992). Having persuasively characterized name and likeness rights as commercial rights, however, the Estates cannot turn around and argue that rules of abandonment applicable to every other commercial mark under the Lanham Act should be suspended as to name and likeness marks. Congress did not create a "name and likeness exception" to the definition of "abandonment" in 15 U.S.C. § 1127.

The last sentence of the definition of "abandonment" drives the point home. It states: "'Use' of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in the mark." *Id.* The Estates' argument is essentially that a person's heirs have the right in perpetuity to "reserve" the decedent's name and likeness. "The Lanham Act does not permit such warehousing of trademarks." *Ambrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1550 (11th Cir. 1986). Instead, to avoid abandonment, the Estates either needed to use Ruthie's name and likeness or develop concrete plans for doing so. For thirty years, they have done neither, and thus the mark is "abandoned" for Lanham Act purposes. *See Silverman*, 870 F.2d at 47; *Philip Morris*, 899 F.2d at 1583 ("Imperial simply has proffered no viable excuse for nonuse of the mark for over five years. The *prima facie* case of abandonment of the mark arising from that nonuse was, therefore, not overcome.").

It bears repeating that "abandonment" has a different meaning under the Lanham Act than under Iowa common law based on the former's inclusion of a presumption of abandonment after three years of non-use. *See id.* at 1579. "At common law there was no similar presumption of abandonment of a mark simply from proof of nonuse." *Id.* "A challenger had to prove not only nonuse of the mark but also that the former user *intended to abandon* the mark. However, with respect to rights under the Lanham Act, proof of abandonment was facilitated by the creation of the [] statutory presumption." *Id.* (internal citation omitted); *accord Grocery Outlet Inc. v. Albertson's Inc.*, 497 F.3d 949, 953 (9th Cir. 2007) (Wallace, J., concurring) ("Judge McKeown also correctly observes that the abandonment defense under the Lanham Act is different than the one under the common law."). In other words, it is easier to establish the affirmative defense of abandonment under the Lanham Act than it is under the common law. Hence the Court's conclusion that the Estates abandoned Ruthie's name and likeness as a matter of law for purposes of the Lanham Act claim but not their common law claims.

For these reasons, the Court GRANTS Exile's motion for summary judgment on the Lanham Act claim based on abandonment (ECF 83; ECF 81 (incorporating ECF 83)) and DENIES the Estates' motion for partial summary judgment on the same claim (ECF 89). This ruling makes it unnecessary for the Court to address the issues of laches or likelihood of confusion on the Lanham Act claims.

## IX.    CONCLUSION.

The viability of the Estates' common law claims must be decided by a jury, and thus the Court DENIES Exile's motions for summary judgment and judgment on the pleadings on those claims. (ECF 74; ECF 77; ECF 83.) By contrast, the Estates' Lanham Act claim fails as a matter of law, and thus the Court GRANTS Exile's motion for summary judgment (ECF 81) and DENIES the Estates' motion for partial summary judgment (ECF 89) on that claim.

**IT IS SO ORDERED.**

Dated: September 26, 2023

_____
STEPHEN H. LOCHER
U.S. DISTRICT JUDGE